IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-3310

_____

CURTIS LEE KYLES,

Petitioner-Appellant,

versus

JOHN P. WHITLEY, Warden, LOUISIANA STATE
PENITENTIARY, ETC., ET AL.,

Respondents-Appellees.


_____

Appeal from the United States District Court
for the Eastern District of Louisiana
_____

(    October 14, 1993   )

Before KING, HIGGINBOTHAM, and JONES, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

Curtis Lee Kyles, an inmate sentenced to capital punishment, appeals the judgment of the district court, denying him the writ of habeas corpus. In 1984, a Louisiana court convicted Kyles of shooting and killing Mrs. Dolores Dye during a daylight armed robbery before many witnesses. As he did before the jury that convicted and condemned him, Kyles asserts innocence and maintains that he was framed by a now-deceased acquaintance. Although phrasing his claims in constitutional terms, Kyles essentially asks this court to reconsider the defensive theory rejected by the jury nine years ago. We affirm.

Kyles alleged numerous constitutional violations in his petition for writ of habeas corpus. In a thorough, forty-six page opinion, the district court rejected all of them. On appeal, Kyles narrowed his focus by briefing only two claims, under Brady and Strickland.[1] As a habeas court, we do not sit to rehear Kyles' trial. Nonetheless, because both Brady and Strickland analyses inquire into probable effects on trial outcomes, we begin by emphasizing this conclusion: a complete reading of the record demonstrates that Kyles faced overwhelming evidence of guilt. In particular, three eyewitnesses positively identified Kyles among a photographic lineup within 96 hours of the murder. Those three, joined by a fourth eyewitness, testified at trial that Kyles was definitely the gunman, even after comparing him with the man that Kyles contends framed him. None of the evidence offered by Kyles-- or that he alleges he was prevented from offering--effectively undermined the powerful weight of this eyewitness testimony.

We also note that the limited focus of a federal habeas court was recently emphasized when the Supreme Court held that "the standard for determining whether habeas relief must be granted is whether the . . . error 'had a substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 113 S. Ct. 1710, 1714 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). This standard controls all trial, as distinguish from structural,

---

[1]Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963); Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).

2

errors--those whose impact may be quantitatively assessed in the context of other evidence in order to determine their effect on trial outcomes.  See Arizona v. Fulminante, 111 S. Ct. 1246, 1249 (1991).

I

On December 7, 1984, a Louisiana jury convicted Curtis Lee Kyles of first degree murder in violation of La. R.S. 14:30 and sentenced Kyles to death.[2]  The conviction and sentence were affirmed on direct appeal by the Supreme Court of Louisiana in a published opinion.  State v. Kyles, 513 So. 2d 265 (La. 1987), cert. denied, 486 U.S. 1027 (1988).  The Supreme Court of the United States denied Kyles' petition for a writ of certiorari on direct appeal.  On January 2, 1989, Kyles commenced state habeas corpus proceedings by petitioning the state district court for a stay of execution, post-conviction relief, writ of habeas corpus, and a new trial based on newly-discovered evidence.  This petition alleges that Kyles' constitutional rights had been violated in twenty ways.  Following an evidentiary hearing ordered by the Louisiana Supreme Court, the state district court denied Kyles' motions and rendered judgment.  In September 1990, the Louisiana Supreme Court denied Kyles' application for review of the judgment.

Soon after the state court set an execution date, Kyles commenced this habeas corpus proceeding in federal court pursuant to 28 U.S.C. § 2254.  The federal district court reviewed the

---

[2]A previous trial ended in a mistrial after four hours of deliberation because jurors could not reach an unanimous verdict regarding guilt or innocence.

entire record, including the transcripts and pleadings from the trial court, direct appeal, and state collateral proceedings. Concluding that Kyles was given a fundamentally fair trial with able assistance by counsel, the district court denied Kyles' petition for writ of habeas corpus on March 24, 1992.

Kyles filed a notice of appeal on April 2, 1992. The district court issued a certificate of probable cause. After filing his notice of appeal, Kyles filed a Rule 60(b) motion for post-judgment relief in the district court, claiming newly-discovered evidence. We granted a motion to hold this appeal in abeyance pending the disposition of that motion. The district court denied the Rule 60(b) motion on June 2, 1992. On August 7, 1992, we vacated the district court's June 2, 1992 order and remanded with instructions to deny Rule 60(b) relief on the ground that a petitioner may not use a Rule 60(b) motion to raise constitutional claims that were not included in the original habeas petition. This appeal then proceeded.

## II

At approximately 2:20 p.m. on September 20, 1984, Mrs. Dolores Dye, a sixty-year-old woman, was murdered in the parking lot at the Schwegmann Brother's grocery store on Old Gentilly Road in New Orleans. Testimony at trial established that a young black man accosted Mrs. Dye as she placed her groceries in the trunk of her red Ford LTD. One witness testified that the victim threw her purse into the trunk, slammed the lid, and tried to get away. The assailant grabbed her, they began struggling, and he wrestled her

4

to the ground. Finally, the assailant drew a revolver from his waistband and fired it into Mrs. Dye's left temple, killing her instantly. The gunman then took Mrs. Dye's keys from her hand, got into the Ford LTD, and drove from the parking lot.

After turning onto the street, a traffic light caused the LTD to stop beside a truck driver, Robert Territo, who had seen the shooting and then viewed the gunman's face at close range. Another witness, Isaac Smallwood, was working at the corner of the parking lot. The LTD drove close by him after it left the parking lot, allowing Smallwood to see the driver's face. Henry Williams was also working outside at the parking lot. He witnessed the struggle and murder and saw the gunman's face as the LTD passed slowly by on the street within twelve feet of him.

Police spoke to Smallwood, Williams, and three other eyewitnesses at the scene. Later, Territo and Darlene Cahill called police to report witnessing the murder. All of these witnesses described a young black man, who wore a dark-colored shirt, blue jeans, and his hair in plaits.

The investigation was aided on Saturday night, September 22, when Joseph "Beanie" Wallace informed officers that a man named "Curtis" had sold him a red Ford LTD. Using the address Beanie provided, police found Curtis Kyles' name and Beanie identified Kyles' photograph. Beanie stated that on Friday, he paid Kyles $400.00 for the LTD and drove it around New Orleans. Only later did he connect the car with the murder and call police. Detective John Miller testified during post-conviction proceedings that

Beanie had spoken to him on previous occasions about various, unrelated shootings, although this case was the first time that Detective Miller could use Beanie's information because it was a homicide. Around midnight, Beanie led police to the car that Kyles sold him. Police soon established that the LTD in Beanie's possession belonged to the victim.[3]

For security purposes, a police officer was wired to record this conversation. During it, Beanie informed officers that Kyles lived at 2313 Desire, the apartment of Kyles' common-law wife, Martina "Pinkie" Burns.[4] Beanie claimed that Kyles had removed Schwegmann's grocery sacks from the LTD before turning it over to Beanie. Acting on this information, Detectives Lambert and Saladino went to Desire Street at 1:00 a.m., Monday morning, September 24. They picked up five identical plastic bags of garbage that had been placed outside Kyles' residence. Inside one of those garbage bags, police found the victim's purse, identification, and other personal belongings wrapped in a Schwegmann's paper grocery sack.

A search warrant for the Burns/Kyles residence had been issued at 6:07 p.m. on September 23. At approximately 10:40 a.m. the following day officers arrested Kyles outside the residence and searched the apartment. Behind the stove, they found a .32 caliber

---

[3]The police agreed to pay Beanie $400.00 to compensate him for the amount that he had paid to Kyles for the car.

[4]This name sometimes appears in the record spelled "Burnes." We use the term "common-law wife" loosely. Pinkie was the mother of Kyles' four children, and he spent about four nights a week at her apartment on Desire Street.

revolver that contained five live rounds and one spent cartridge. Ballistics tests later confirmed that this pistol was used to murder Mrs. Dye. In a chifforobe in another part of the residence, officers found a homemade shoulder holster that fit the murder weapon. They also discovered two boxes of ammunition in a bedroom dresser drawer. One box contained .32 caliber rounds of the same brand as those found in the pistol.

Back in the kitchen, pet food was found in Schwegmann's sacks located in a cabinet with pots and pans. No other human or pet food was located in that cabinet. Several cans of cat and dog food were discovered, including Nine Lives brand cat food and Kal-Kan brand dog food. No pets, however, were present in the household. Detective Dillman testified that police found no cat litter nor a litter box, although a photograph of the chifforobe shows a bottle labelled "Hart Flea." The victim's husband, Mr. Robert Dye, testified at trial that his wife usually purchased several of brands for their cats and dogs, including Nine Lives and Kal-Kan.

Partial fingerprints were found on the victim's effects, but none was sufficient for an identification. No fingerprints were found on the murder weapon or in the LTD, but Kyles' prints were recovered from a Schwegmann's cash register receipt found on the floor of the LTD. The receipt's contents were illegible, making it impossible to read the items purchased or date, because the

7

chemical process used to raise the fingerprints obliterated the ink.[5]

After Kyles became a suspect, Detective John Dillman prepared a photographic lineup. On Monday, September 24, Dillman showed the lineup to five eyewitnesses to the murder. Three of them instantly picked Kyles out from the array of photographs of young black men; another tentatively chose Kyles. These three witnesses, as well as a fourth eyewitness who was not asked to view the photographic lineup, also positively identified Kyles at trial as the gunman.

The defense contended at trial that the initial informant, Beanie, framed Kyles. While Kyles denied any involvement in the murder, his defense implied that Beanie was the murderer. After all, Beanie possessed the LTD when he spoke to police, and the defense theory accused Beanie of planting the victim's possessions and the murder weapon at Kyles' residence. Beanie did not testify at the trial for either the prosecution or the defense. Four defense witnesses--Kevin Black, Ronald Gorman,[6] Johnny Burns, and Kyles himself--testified that they saw Beanie in a red car similar to the victim's after the killing on Thursday, September 20.[7] Defense witness Donald Powell stated that Beanie tried to sell him the LTD on Friday for $300. Johnny Burns testified that Beanie

_____

[5]Before the piece of paper was processed, the police had noted that it was a cash register receipt from Schwegmann's, but no other information regarding its contents was recorded.

[6]Gorman admitted at trial to a felony conviction for armed robbery.

[7]Black, Gorman, and Burns admitted that they were friends of Kyles. Johnny Burns was his brother-in-law.

changed the license plates on the LTD Friday night, demonstrating that Beanie knew the car was stolen.

Central to defense was the theory that Beanie had planted the most incriminating evidence in Kyles' apartment and garbage. Defense witnesses testified that Beanie attended a gathering at Kyles' residence on Sunday night, September 23. The testimony of Kyles' friends and relatives conflicted as to the number of persons present and what dinner was served. Johnny Burns, Pinkie's brother and so Kyles' brother-in-law, testified that during this evening he saw Beanie stooping near the stove. As noted, the murder weapon was found behind this appliance. Kyles also testified in his own defense. He denied owning the revolver and holster and stated that they must have been planted in the apartment. To explain the presence of .32 caliber rounds, Kyles stated that they were among ammunition he received when Beanie gave him a .22 caliber rifle as security for a loan. As a motive for the alleged effort to frame Kyles, the defense contended that Beanie was romantically interested in Pinkie Burns, Kyles' common-law wife. Defense witnesses Cathy Brown and Carolyn Campbell said that they had witnessed Beanie make sexual advances to Pinkie.

Kyles denied any involvement in the shooting of Mrs. Dye. To explain the Schwegmann's receipt bearing his fingerprints found in the LTD, Kyles stated that Beanie had picked him up in a red car on Friday and taken him to Schwegmann's, where Kyles purchased transmission fluid and a pack of cigarettes. He suggested that the receipt might have fallen from the bag when he removed the

cigarettes.  Kyles also testified that he had purchased the pet food found in his apartment at Schwegmann's on another occasion. Kyles claimed that he owned a dog, which it was sometimes kept in Mississippi at his mother-in-law's home.  He did not know where it was at the time of trial.  He also stated that his son kept a cat and that they fed other stray cats.  Other defense witnesses gave varying testimony as to whether or not Kyles or his children had a dog or cat.  When asked why he had purchased "so much" pet food, Kyles responded that he had "because it was on sale" at Schwegmann's.  On rebuttal, the prosecution called Schwegmann's director of advertising to testify.  Examining the cans of pet food, he denied that these brands had been on sale, explaining that the prices marked on the cans were not marked-down sale prices. During the prosecution's case-in-chief, the victim's husband testified that Mrs. Dye usually purchased the same brands of pet food as those found in Kyles' residence.

During rebuttal, the prosecution recalled each eyewitness. Beanie was brought into the courtroom, giving each eyewitness a chance to view him and Kyles simultaneously.  The jury could also compare Beanie with Kyles.  Each of the eyewitnesses attested that Kyles, not Beanie, was the person who committed the murder.

The jury unanimously found Kyles guilty of first degree murder.  During the sentencing phase, the prosecution relied upon the evidence adduced during the guilt phase.  The defense sought mitigation by presenting evidence of Kyles' close familiar relations with his relatives and children.  Kyles also reasserted

10

his innocence.  Finding the aggravating circumstance of a killing during the commission of an armed robbery, the jury unanimously recommended the death penalty.

At the post-conviction evidentiary hearing, Kyles asserted that prosecutors had failed to disclose Brady materials to the defense.  A number of documents in the police file were not delivered to the district attorney's office until after Kyles' conviction.  Kyles received them during post-conviction litigation and maintains that they were favorable and material to his defense.

## III

### A. Brady

Kyles' principal claim is that the State withheld purportedly inculpatory material.  In particular, he points to the following evidence that was not produced before trial:  (1) the transcript of the recording of Beanie's first conversation with police officers; (2) a written statement signed by Beanie after police interviews; (3) notes taken by prosecuting attorney Cliff Strider during an interview with Beanie; (4) a police memorandum directing officers to pick up the garbage in front of 2313 Desire Street; and (5) a list of license plate numbers from cars parked at Schwegmann's on Thursday night, September 23.

### 1. Governing legal standard

Our concern as a habeas court is confined to reviewing for constitutional violations.  "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or

11

punishment."  Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196 (1963).  The prosecution must also disclose evidence useful to the defense for impeachment.  United States v. Bagley, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380 (1985).  A successful Brady claim must show (1) the prosecution's suppression of evidence, (2) the favorableness of that evidence, and (3) the materiality of that evidence.  United States v. Sink, 586 F.2d 1041, 1051 (5th Cir. 1978).

The Supreme Court defined materiality in United States v. Bagley, 473 U.S. 667, 105 S. Ct. 3375 (1985).  According to Bagley,

> evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

Id. at 682, 105 S. Ct. at 3383 (Blackmun, J.); id. at 685, 105 S. Ct. at 3385 (White, J., concurring in part).  Writing for the Court, Justice Blackmun stated that "a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial."  Id. at 678, 105 S. Ct. at 3381.

Kyles argues that Bagley's analysis cannot be used in capital cases.  We have previously rejected this general proposition.  See James v. Whitley, 926 F.2d 1433, 1437 (5th Cir. 1991).  Kyles raises a slightly different argument than the one presented in James, by insisting that the alleged Brady violation affected not only the guilt determination, but his sentence as well.  Thus, Kyles argues, Eighth Amendment considerations are triggered which

12

require a stricter scrutiny than <u>Bagley</u>'s probable-effect inquiry. Kyles therefore urges this court to use the "no effect" standard found in <u>Caldwell v. Mississippi</u>, 472 U.S. 320 (1985), or the "harmless beyond a reasonable doubt" standard referred to in <u>Satterwhite v. Texas</u>, 486 U.S. 249 (1988). In this case, the only effect the alleged <u>Brady</u> materials could have had on his sentencing would be through residual doubt. Kyles presented no mitigating evidence other than his close relationships with his family. The State relied upon the aggravating factor of murder during an armed robbery, which the jury found proved beyond a reasonable doubt in the guilt phase. We are not persuaded that the Eighth Amendment forecloses using the <u>Bagley</u> standard, when the only effect of <u>Brady</u> material would be to enhance the possibility of residual doubt after a jury finds guilt beyond a reasonable doubt.

### 2. Review of the evidence

We apply the <u>Bagley</u> standard here by examining whether it is reasonably probable that, had the undisclosed information been available to Kyles, the result would have been different. Rather than reviewing the alleged <u>Brady</u> materials in the abstract, we will examine the evidence presented at trial and how the extra materials would have fit.

### a. Eyewitness testimony

The murder occurred around 2:20 p.m. in the parking lot of Schwegmann Brother's grocery store. Photographs of the crime scene taken that afternoon show a bright, sunny day. Many witnesses saw the murder, their attention prompted by the victim's screams, and

13

then saw the gunman's flight in the victim's car. Three of the eyewitnesses later identified Kyles in a photographic lineup. At trial eleven weeks after the murder, four witnesses identified Kyles as the gunman. Significantly, during each eyewitness's rebuttal testimony, Beanie was brought into the courtroom. After viewing Beanie and Kyles simultaneously, each eyewitness once more identified Kyles as the murderer. Also, the members of the jury received four opportunities to view both Beanie and Kyles after hearing the witnesses' descriptions of the gunman.

Kyles tried to undermine these identifications by pointing to discrepancies between his hairstyle and that in descriptions of the gunman. Territo, for instance, described the gunman's hair as a "wooly type braid" or "matted braid". Defense witness Carolyn Campbell stated that Kyles always wore his hair in a "bush" style. Kyles testified that he never wore his hair in plaits or braids. On the other hand, the defense claimed that Beanie fit the descriptions. Kyles' friends Kevin Black and Ronald Gorman testified that Beanie wore braids in his hair on Thursday, September 20. Donald Powell claimed that Beanie usually wore braids, but a police photograph taken on June 6, 1984, shows that Beanie was wearing a Jherri curl fifteen weeks before the murder. Johnny Burns claimed that Beanie changed his hairstyle to a curl on Friday, September 21, after the murder.

Kyles contends that the first of the alleged Brady materials affects this identity issue. A police wire recorded Beanie's first conversation with police officers. This was done as a security

14

measure, rather than as a means to preserve evidence. The transcript of this recording was not delivered to the prosecuting attorney before trial and not disclosed to Kyles. According to this transcript, after stating that "Curtis" sold him the LTD on Friday, Beanie said that Kyles wore his hair in a bush "that day." We do not agree that this statement made the transcript material and so mandated disclosure. The jury otherwise learned of the supposed discrepancy between descriptions of the gunman's hairstyle and Kyles' hairstyle. Beanie's statement adds nothing new and is itself not decisive. Even if Kyles wore a bush "that day"--Friday--he may have worn braids on Thursday. The transcript also contains Beanie's statement that Kyles sometimes wore braids.

Kyles also claims that a second set of undisclosed documents impeded his challenge to the eyewitness identifications. He did not receive written statements signed by Smallwood and Williams. Kyles maintains that the jury's confidence in the eyewitness identifications would have been undermined if the defense could have impeached these two men with inconsistent statements in the descriptions they gave to police just after the murder. Williams, for example, originally described the gunman as being around 5'5" with a medium build. Kyles is closer to six feet tall and is slender. Yet when shown Kyles picture four days after the murder, Williams immediately recognized him as the killer. Kyles argues more forcefully regarding Smallwood. At trial, Smallwood described witnessing the shooting itself. The original statement he signed, however, states that he turned to look after hearing the gunshot.

15

This discrepancy, Kyles insists, shows that Smallwood embellished his story, perhaps after coaching. Kyles overlooks, however, that Smallwood consistently stated that the gunman then drove the LTD close by him. Smallwood always maintained that he got a good look at the killer then, and like Williams, immediately recognized Kyles in the photographic lineup. Smallwood never made a statement calling his ability to recognize the gunman into question, and we are not persuaded that use of this material by the defense would have undermined the force of his identification, particularly in light of its corroboration by others.

To support the inference of mistake, Kyles cited testimony that he and Beanie resembled one another. Defense witness Ronald Gorman, for instance, stated that Beanie and Kyles resemble each other "a little" in profile. Gorman admitted, however, that the two men's sizes and builds were not alike. Johnny Burns also testified that the two men look alike from the side and had similar complexions. This testimony is belied, however, by the finding of the state trial court, during post-conviction proceedings, that Beanie "distinctly did not resemble" Kyles. Comparing photographs of Kyles and Beanie, it is evident that the former is taller, thinner, and has a narrower face. More importantly, the eyewitnesses and the jury were allowed to compare Beanie and Kyles. After doing so, Smallwood stated, "they don't look nothing alike to me." Each eyewitness repeated their conviction that Kyles was the gunman they saw at Schwegmann's.

16

We note that none of the undisclosed documents bear on the credibility of eyewitness Territo's testimony. Territo observed Kyles and Mrs. Dye struggle, and witnessed the shooting itself. Then, as Kyles drove away in the LTD, he stopped at a red light in the lane next to Territo. As Kyles looked around, Territo got a good look at his face from a short distance away. Territo positively identified Kyles as the gunman in a photographic lineup four days after the murder, and positively identified Kyles at trial twice--the second time after seeing Beanie and Kyles together. There is no evidence in the record that Territo made inconsistent statements at any time.

The theory that Beanie framed Kyles cannot explain the eyewitnesses' positive identifications. Kyles must assert that all four of them were mistaken. At trial, Kyles' counsel elicited from the eyewitnesses that they had previously seen Kyles in the courtroom.[8] The defense suggested that the in-court identifications resulted from Kyles' presence at the defendant's table, reinforced by viewing him there on prior occasions. This implication, however, could not weaken the three out-of-court identifications. Territo, Smallwood, and Williams each selected Kyles from among six similar photographs. There is no evidence that these photographic lineups, four days after the murder, were conducted improperly. Kyles can make no response but the improbable assertion that each witness coincidentally made the same

_____

[8]Counsel implicitly referred to the first trial and suppression hearing. The jury was not informed of the prior trial.

17

mistake.  We must bear this weighty evidence of guilt in mind while assessing the probable effect of other undisclosed information on the jury's verdict.

### b. Tangible evidence

While the eyewitness identifications are convincing, Kyles is also faced with the great deal of incriminating evidence found in the apartment where he usually resided.  The defense must also discount much of this evidence as coincidental.  The remainder, however, Kyles attributes to Beanie's alleged effort to frame him.

Kyles maintains that the nondisclosure of the transcript also weakened his ability to establish Beanie's motives for framing him. The transcript assertedly contains three statements that may do so. First, in describing the trip to retrieve Kyles' car from the Schwegmann's parking lot, Beanie referred to the part of the lot where the murder had taken place.  Kyles would infer from this statement Beanie's knowledge of, and hence involvement in, the murder.  Second, Beanie described driving around New Orleans in the stolen LTD and his concern that he might be arrested because of this possession.  These statements, Kyles argues, lead to one motive:  that Beanie framed Kyles in order to escape prosecution himself for murder, complicity in murder, or dealing in stolen goods.  Finally, the transcript reveals that Beanie requested $400 as reimbursement for the amount he paid Kyles for the stolen LTD. Kyles translates this statement into another motive by arguing that Beanie framed him to get a monetary reward.

18

At trial, Kyles elicited testimony supporting these two motives, as well as a third: that Beanie framed Kyles so that Beanie could pursue his romantic interest in Pinkie Burns. The principal thrust of the defense case was that Beanie committed the murder. During cross-examination, Detective Dillman testified that Beanie possessed Mrs. Dye's LTD. Defense witnesses testified that Beanie fit the gunman's description. The presence of the murder weapon was attributed to Beanie's visit to Kyles' apartment. We are not persuaded that Beanie's reference to the scene of the murder adds significant weight. The transcript also reveals that Beanie followed news accounts of the crime after they alerted him to the connection between the LTD and the murder. As to a pecuniary motive, Detective Dillman told the jury that Beanie received $400 after giving his tip. Beanie's request for the money on the transcript would have been cumulative, at best.

As further support for the defense theory, Kyles elicited testimony from the police that stolen license plates were on the LTD when it was found. Johnny Burns testified that he saw Beanie change the plates. The defense maintains that this evidence dispels any notion that Beanie was the unwitting bona fide purchaser of a stolen car. Once more, Kyles claims that the jury would have attached more significance to this evidence if the State had disclosed the transcript. It is true that on the transcript Beanie did not deny placing stolen plates on the LTD, even as officers made statements to that effect, but the state never urged and no prosecution witness ever stated that Beanie was an innocent

19

buyer.  The State did not call Beanie as a witness, nor inform the jury of the contents of his initial tip to police.  Thus, the character or credibility of the informant was not presented to the jury by the prosecution.[9]  Beanie's tip served only to explain why police showed Kyles' photograph to the eyewitnesses.  The defense established that Beanie had possession of the LTD and that it bore stolen plates.  A witness testified that Beanie placed them on the car.  Thus, Kyles did lay the foundation for inferring that Beanie was not an unwitting buyer of stolen goods, but rather a knowing possessor who might have been the robber.  On the other hand, proof that Beanie changed the plates is not inconsistent with Kyles' guilt.  Ultimately, this evidence is at best cumulative on a factual point not rebutted by the State.  The nondisclosure of this much of the transcript was insignificant.

Kyles also complains that the failure to disclose the transcript, and two other documents containing statements by Beanie, impaired his defense by preventing him from showing inconsistencies among those statements.  After the recorded conversation shown by the transcript, Beanie went to police headquarters and signed a typewritten statement in the early morning hours of Sunday, September 23.  Sometime later, before Kyles' trial and conviction, prosecuting attorney Cliff Strider interviewed Beanie and wrote several pages of notes regarding Beanie's statements at that time.  Neither Beanie's written statement nor Strider's notes were disclosed to the defense before

---

[9]This factor is discussed further _infra_, section III.B.

20

trial.  Kyles claims that the defense could have furthered its case by informing the jury of inconsistencies, principally between the first two statements and Strider's notes.

In the first two statements, Beanie described this sequence of events:  on Friday evening, September 21, Kyles sold the LTD to Beanie.  Beanie then saw Kyles unload Schwegmann's grocery sacks and a purse from the LTD and place them in his apartment at 2313 Desire Street.  After 9:00 p.m., Beanie accompanied Kyles and others to the Schwegmann's parking lot, where they retrieved Kyles' own car.  Prosecutor Strider's notes generally reflect the same events, but the dates, sequence, and some details changed. According to the notes, Beanie and Kyles retrieved Kyles' car from Schwegmann's on Thursday, at 7:45 p.m., rather than Friday after 9:00 p.m.  Then, Beanie saw Schwegmann's sacks and a purse taken, not from the LTD, but from an apartment, whence they were taken to Kyles' apartment.  The notes then state that Beanie purchased the LTD after the events, on Friday morning, rather than Friday evening.

The date of Strider's interview and notes is not disclosed by the record.  Thus, the time span between the first two statements and this interview is unknown and the relative weight of the discrepancies is difficult to gauge.  This is but one problem. More importantly, evidence that Beanie lacked credibility would have had little impact on this case.  The prosecution did not call Beanie as a witness, nor vouch for the reliability of the tip that he gave police.  Instead, the State mentioned this tip in passing,

21

to explain why it focused on Kyles as a suspect and discovered evidence conclusively linking him to the murder.

While the defense portrayed Beanie as framing Kyles, it did not call Beanie as a defense witness. As we will explain in Section III.B., that decision was sound.[10] Calling Beanie as a witness threatened to do Kyles more harm than good, even if the defense could show that details of Beanie's claims were not consistently stated. Since Beanie did not testify, and there was no constitutional compulsion that he should have been, the failure to possess impeachment evidence material could not, in reasonable probability, have affected the outcome of the trial. Kyles has not shown on this basis that the three statements were material.

Detective Lambert testified during cross-examination that he picked up Kyles' garbage bags from the curb without apparent detection. Kyles' residence was not under police surveillance until after sunrise the following morning. The defense counsel used this cross-examination to establish that someone could just as easily have placed bags in that location, or put Mrs. Dye's purse into bags already there. The defense maintained that Beanie did so. Kyles now asserts that he could have argued this point more powerfully with two pieces of alleged Brady material. One was a police memorandum directing officers to pick up Kyles' garbage.

_____

[10]As the dissent maintains, the Brady and Strickland claims are related, at least in part. In Section III.B., we conclude that defense counsel was not deficient in deciding not to call Beanie to testify. Beanie did not testify and impeachment material did not affect the trial. Our Strickland holding thus supports our Brady decision.

22

The memo stated, "[w]e have reason to believe the victim's personal papers and the Schwegmann's bags will be in the trash." According to Kyles, Beanie was the person who gave the police reason to believe that this evidence would be found. Kyles supports also this assertion with the transcript. In it, a police officer refers to Beanie having stated that if Kyles were smart, he would throw the items from the LTD into his garbage. Kyles argues that these documents would have strengthened his theory that Beanie planted the purse in Kyles' garbage and directed the police to find it there.[11]

Even without these documents, Kyles made a credible case that Beanie could have planted this evidence. It was undisputed at trial that anyone could have had access to garbage bags sitting on the curb and that Beanie was attempting to incriminate Kyles. Kyles was able to argue that Beanie had one or more motives and an opportunity to plant this evidence where the police found it. Nonetheless, the jury rejected this argument. These documents might have offered some assistance to Kyles. In light of the entire record, however, we cannot conclude that they would, in reasonable probability, have moved the jury to embrace the theory it otherwise discounted.

To explain the murder weapon and holster, the defense depended upon testimony that Beanie had attended a gathering at Kyles'

---

[11]Kyles also argues that knowledge of these statements would have led defense counsel to call and cross-examine Beanie regarding the garbage bags. For reasons stated infra, section III.B., we fail to see how Beanie's testimony would have assisted Kyles.

apartment on Sunday night, September 23. Several defense witnesses stated that Beanie was present at 2313 Desire that evening, and had dinner with Kyles and others. Johnny Burns stated that as many as 18 people attended the gathering, while Cathy Brown remembered six being present. The State questioned the credibility of these witnesses, given inconsistencies among their statements, but presented no testimony that this gathering did not occur. Asserting yet another <u>Brady</u> violation, Kyles points to the notes of prosecutor Cliff Strider's interview with Beanie. These notes refer to Beanie's presence at Kyles' apartment for Sunday dinner. Corroborating Beanie's presence, however, adds little credibility to an assertion that Beanie smuggled evidence in and hid it about the apartment on that occasion.

Johnny Burns claimed that he came upon Beanie alone in the kitchen, stooping next to the stove under which the murder weapon was found. During the state post-conviction hearing, the same trial court judge who presided over Kyles' trial found that Johnny Burns' testimony was not credible. "This Court, having had the opportunity to view Mr. Burns on the witness stand and to hear his testimony, has chosen to totally disregard everything that he has said."[12] This trial court finding of fact is fairly supported by the record and must be presumed to be correct. 28 U.S.C. § 2254(d). Even aside from § 2254, appellate courts must give due

---

[12]Between the time of Kyles' conviction and the post-conviction hearing, the same trial court judge presided over the trial and conviction of Johnny Burns for the 1986 shooting death of Joseph "Beanie" Wallace. <u>See</u> <u>State v. Burnes</u>, 533 So. 2d 1029 (La. Ct. App. 1988).

regard to the credibility determinations of trial judges, who enjoy the advantage of observing demeanor. See Amadeo v. Zant, 486 U.S. 214, 108 S. Ct. 1771 (1988). Given that Johnny Burns' testimony lacked credibility, it is unlikely that the jury attached much weight to his claims.

Kyles testified that Beanie offered to sell him a pistol with tape wrapped around it that evening. The murder weapon, however, showed no signs of having been wrapped in tape. This testimony added nothing to the theory that Beanie planted the evidence.

If Beanie was present at Kyles' apartment on Sunday, this opportunity to plant evidence came after Beanie had contacted the police and implicated Kyles. If Beanie had been bent on framing Kyles, it was risky indeed to direct officers to the residence on Desire Street before he planted the evidence. Beanie did not know when the police might move. Indeed, he did not plant the gun until the night of the day following his disclosure to the police. The defense theory attributes cleverness to Beanie in every detail except this one. Once again, we conclude that the undisclosed documents would have been essentially cumulative on a point that the prosecution questioned, but did not rebut. We are not persuaded that these notes were material.

Kyles complains that he did not receive a computer printout containing a list of automobile license plates. This printout listed cars that were in Schwegmann's parking lot at 9:15 p.m. on the day of the murder, September 20. The list does not include Kyles' automobile. Beanie's initial statements to the police

25

indicated that Kyles had retrieved his car from Schwegmann's on Friday. Using a photograph of the crime scene taken Thursday afternoon, the prosecution argued that Kyles car was visible at a distant edge of the lot. Kyles argues that the undisclosed printout would have rebutted this evidence, showing the jury that his car was not present at the crime scene.

During post-conviction proceedings, Detective John Miller testified that not all vehicles were included in the canvas and license check that produced the printout. Thus, the printout did not disprove that Kyles' car was present at 9:15 p.m. Moreover, a list of cars found at 9:15 p.m. could not disprove that Kyles' automobile is the one visible in the photograph taken at the crime scene roughly six hours earlier.[13] Although the prosecution used the photograph to establish how Kyles arrived at Schwegmann's, before departing in the stolen LTD, no witness stated that Kyles' car remained there overnight. Thus, the printout was not inconsistent with the State's proof of guilt. More importantly, of course, we are not persuaded that it would, in reasonable probability, have induced reasonable doubt where the jury did not find it. The evidence of guilt was otherwise so overwhelming that the rebuttal of the photograph would have made no difference.

Finally, in assessing the probable effect of nondisclosure on Kyles' trial, we must consider evidence of guilt that is untouched

---

[13]As Kyles has seized upon in these proceedings, prosecuting attorney Strider's notes reflect that Beanie and Kyles retrieved Kyles' car from the Schwegmann's parking lot at 7:45 p.m. on Thursday.

by the alleged <u>Brady</u> violations.  First, we consider the ammunition found in his apartment.  Kyles claimed that Beanie gave him the two boxes of ammunition along with a .22 caliber rifle as security for a loan.  He had loaded .22 caliber rounds into the rifle and left the other assorted ammunition in the boxes.  He testified that Beanie often had guns, accounting for the other calibers, including the large number of .32 caliber rounds.  While the evidence seized included mixed caliber rounds in one box, another box contained only .32 caliber cartridges.  It makes sense that Beanie would have given Kyles a container holding .22 ammunition, along with other rounds, at the same time that he gave Kyles a .22 rifle.  It is not clear, however, why someone would also have given Kyles a box containing only .32 caliber rounds if Kyles did not own a .32 caliber firearm.  The more likely inference, apparently chosen by the jury, is that Kyles possessed .32 caliber ammunition because he possessed a .32 caliber firearm.  As noted, these rounds were the same brand as those found loaded in the murder weapon found in Kyles' residence.

It must not be forgotten that Kyles had to explain his possession of every piece of the incriminating evidence.  Yet, no undisclosed document lessens the impact of the evidence regarding pet food from Schwegmann's.  Kyles tried to account for its presence, but likely did his cause more harm than good.  Kyles testified that he purchased at Schwegmann's the pet food found in his apartment.  He must dismiss as coincidence the fact that Mrs. Dye usually purchased the same brands that he claimed to have

27

chosen on one occasion because they were "on sale."  In the first place, the weight of his explanation was undermined by his inability to explain what pets he planned to feed.  He claimed to have kept a dog in the backyard, although it was sometimes kept in the country.  Kyles stated that he had brought it home shortly before the murder.  Police, however, found no sign of this pet.  A friend of Kyles, Donald Powell, had not seen the dog for six months.  When asked to explain why he purchased different brands of cat food, Kyles claimed that one was for his son's cat, the other for strays.  He did not explain any reason, such as a lower price for the latter, for making this distinction.[14]  Most importantly, Kyles' explanation for the choice and quantity suffered a devastating attack from the State when it called Schwegmann's director of advertising.  The brands found in Kyles' residence were not "on sale" in September 1984.[15]  During post-conviction proceedings, the state trial court cited this rebuttal evidence in concluding that Kyles had perjured himself at trial, and opined that the jury was moved to disregard the defense's theory when Kyles' testimony was thus discredited.

---

[14]In contrast, the victim's husband explained that their finicky cats would not eat the same brands, causing them to purchase a variety.

[15]The effort to recast Kyles' explanation as meaning "for sale" rather than "on sale" makes no sense in context.  All brands of pet food were "for sale," so that interpretation cannot explain why Kyles choose Kal-Kan and Nine Lives.  Nor would it explain why he brought home more than a dozen cans at one time for two family pets.  The common meaning of "on sale"--marked down--would provide such explanations, but was contradicted by the Schwegmann's employee.

As the state trial court found, in post-conviction proceedings:

> the Defense was given ample opportunity, and successfully placed before the jury through credible evidence, the basic premise of the Defense's case, that Joseph [Beanie] Wallace was in fact that killer of Mrs. Dye and that Joseph Wallace "framed" the defendant for this killing.
> . . .
> The jury was more than adequately exposed to the possibility that Joseph Wallace was in fact the killer.

The jury, however, refused to believe this testimony or to infer even reasonable doubt from it. Kyles received a fair trial, one whose outcome is reliable. Kyles failed to undermine the overwhelming evidence of guilt at trial, and we are not persuaded that it is reasonably probable that the jury would have found in Kyles' favor if exposed to any or all of the undisclosed materials. Often cumulative and generally inconclusive, the facts therein simply do not add enough to his case.[16]

Finally, we note that Brady claims are subject to harmless error review. See United States v. Garcia, 917 F.2d 1370, 1375 (5th Cir. 1990). Since Kyles has failed to show that it is reasonably probable that the nondisclosure of documents affected the outcome of his trial, we will not address whether he can show

_____

[16]Judge King attaches significance to the fact that Kyles' first trial resulted in a mistrial. The first jury deadlocked in this capital case in just four hours. We can only speculate as to the reason. While some jurors may have seen the prosecution's case as weak, it is also possible that a juror's concerns about capital punishment promptly caused the intractable disagreement. We attach little significance to an event whose cause is unknowable, and rely instead upon our review of the record, as informed by the judgments of the state trial court and district court. Whatever the proof offered in that trial, this transcript contains overwhelming evidence of guilt.

the actual prejudice of a substantial and injurious effect on the verdict.  See Brecht v. Abrahamson, 113 S. Ct. 1710, 1722 (1993).

## B. Strickland

Kyles also contends that he received ineffective assistance of counsel at trial.  See Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).  Kyles points to two principal errors allegedly committed by his trial counsel:  failing to interview Beanie and failing to call Beanie as a defense witness.  Under Strickland, Kyles must satisfy a two-prong test by showing that:  (1) counsel's performance was so deficient that he was not functioning as the counsel guaranteed by the Sixth Amendment, and (2) counsel's errors prejudiced the defense by depriving the defendant of a fair trial whose result is reliable.  Id. at 687, 104 S. Ct. at 2064.  To demonstrate professional deficiency, Kyles must show that counsel's performance "fell below an objective standard of reasonableness." Id. at 688, 104 S. Ct. at 2064.  Given the difficulty of this evaluation and the distorting effect of hindsight, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  Id. at 689, 104 S. Ct. at 2065 (internal quotation omitted).

Kyles' trial counsel was Martin Regan.  Kyles maintains that Regan's failure to call Beanie--coupled with the prosecution's nondisclosure of the contents of Beanie's statements--prevented the

30

defense from attacking Beanie's credibility.  The prosecution's case, however, did not depend upon Beanie's credibility.  The State did not call Beanie to testify against Kyles.  Prosecution witnesses did not mention Beanie by name except in response to the cross-examination by Regan.  Regan asked eyewitnesses whether they had been shown Beanie and questioned Detective Dillman about him.  Then, during redirect testimony, Dillman admitted that the police had no suspect until after Beanie contacted them on Saturday, September 24.  During his direct examination, Dillman had only alluded to Beanie's statements by testifying that officers received information that led them to Mrs. Dye's car, and that caused them to suspect Kyles.  Leaving this testimony unelaborated, the prosecution depended upon the eyewitness identifications and the tangible evidence to link Kyles with the murder.

Of course, the defense did involve Beanie in the case by presenting the theory that Beanie had a motive to frame Kyles and an opportunity to plant evidence on his premises.  Regan's questions laid the foundation supporting this theory.  Regan did not, however, call Beanie as a defense witness.  As a matter of trial strategy, the choice of witnesses enjoys a presumption of reasonableness.  Cf. Rivera v. Collins, 934 F.2d 658, 660 (5th Cir. 1991) (rejecting Strickland claim asserting counsel failed to call important witnesses).  We are not persuaded that the decision not to call Beanie was an unreasonable one outside the bounds of professional judgment.  To the contrary, the dangers of calling Beanie as a defense witness are very evident.  As the district

court put it, any reasonable attorney would perceive Beanie as a "loose cannon."  According to the defense theory, Beanie was intent on seeing Kyles convicted for the murder of Mrs. Dye.  Beanie's testimony almost certainly would have inculpated Kyles.[17]  All of his statements to the police claimed that Kyles had possessed the LTD, sold it, and removed several Schwegmann's grocery sacks from it--testimony not presented to the jury during the prosecution's case-in-chief.  The only exculpatory effect Beanie could have was an indirect one:  Kyles maintains that competent counsel, armed with Beanie's prior statements, would have thoroughly impeached Beanie's credibility.  At the same time, competent counsel would realize the risk that if Beanie's credibility were not completely destroyed by his demeanor and prior statements, then his incriminating testimony would have strengthened the prosecution's case.  The cross examination of Beanie had to face the reality that his version was supported by disinterested eye witnesses.  Only hindsight allows one to say that Kyles had nothing to lose and that counsel should have taken that risk.  See United States v. Lauga, 762 F.2d 1288, 1291 (5th Cir. 1985) (decision not unreasonable just "because 20/20 hindsight and knowledge of the intervening conviction might lead another attorney to opt otherwise").[18]  Beanie

---

[17]No reasonable attorney, believing that Beanie framed his client for murder, would have expected Beanie to take the stand and--as the district court said--give a "Perry Mason confession."

[18]"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Strickland, 466 U.S. at 689, 104 S.

32

was a two-edged sword, and we conclude that Regan did not act unprofessionally in choosing not to draw that weapon at trial.

During post-conviction hearings, Regan stated that the reason he did not call Beanie to testify was his misunderstanding of Louisiana evidence law. He believed that if the defense called Beanie, he would not be able to ask leading questions unless he demonstrated both surprise and hostility. That belief was erroneous,[19] thus Kyles contends that a decision made on that mistaken basis was a professional deficiency. The Strickland analysis, however, judges the conduct of the defense according to the objective standard of the reasonable attorney. For the above-stated reasons, we conclude that a reasonable, competent attorney would not have erred in failing to call Beanie to testify and therefore the actual cause of trial counsel's failure to do so is not controlling.

Furthermore, the record demonstrates that Regan seriously considered calling Beanie. The defense placed Beanie under subpoena during the trial. See State v. Kyles, 513 So. 2d 265, 273 (La. 1987). During the post-conviction hearing, prosecuting attorney Strider testified that Regan discussed calling Beanie as a defense witness with him. The defense, however, had no guarantee

--- 

Ct. at 2065.

[19] In dicta in the direct appeal decision, the Louisiana Supreme Court stated that Beanie "was clearly a witness hostile to the defendant, and defense counsel was entitled to employ leading questions and to impeach the witness through any prior inconsistent statements." State v. Kyles, 513 So. 2d 265, 273 (La. 1987).

about Beanie's behavior.  Strider told Regan that he was not sure Beanie's attitude would be hostile.  Moreover, Strider stated his belief that Regan expected the prosecution to call Beanie to testify during rebuttal, giving Regan a certain opportunity to lead and impeach the witness.  Having considered the issue, Regan made a reasonable choice, and an appropriate one even if he correctly understood the applicable evidentiary rule.

Since Beanie did not testify and we are not convinced that he should have been called to testify, Regan's failure to interview Beanie had no apparent bearing on the conduct of the trial.  It is not evident how interviewing Beanie would have allowed Regan to attack the prosecution's case more effectively, since that case did not rely upon Beanie's statements.  An error by counsel does not satisfy the prejudice element of Strickland unless the defendant shows a reasonable probability that, but for the error, the result of the proceeding would have been different.  Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.  Regardless of whether the failure to interview Beanie constituted a professional deficiency, the requisite prejudice has not been shown.

Finally, Kyles suggested that Regan's failure to interview the eyewitnesses prior to trial led to ineffective assistance.  One month before the trial, however, defense counsel cross-examined three of those four witnesses during the pretrial suppression hearing.  Territo, Smallwood, and Williams testified at the suppression hearing because they made out-of-court identifications based upon a photographic lineup.  We agree with the district

34

court's conclusion that this hearing gave counsel an adequate opportunity to explore these witnesses' stories. Since counsel was not unprepared for the eyewitness testimony at trial, there is no probability that this alleged failure had an impact on the outcome.

IV

In conclusion, we iterate that trial counsel presented Kyles' theory that Beanie framed him. The defense suggested motives, with claims of Beanie's sexual interest in Kyles' common-law wife and by implying Beanie's own guilt for the murder. Counsel established that Beanie could have had access to Kyles' garbage bags on Desire Street. Defense witnesses claimed that Beanie came to Kyles' apartment on the night before the police search, and Johnny Burns testified to seeing Beanie stooping near the stove under which the murder weapon was found. The defense proposed the inference that Beanie framed Kyles. We are not persuaded that either errors by counsel or prosecutorial misconduct hamstrung Kyles' defense. Rather, the jury rejected his defensive theory and viewed the overwhelming incriminating evidence as proof of Kyles' guilt. We are not empowered to substitute our own judgment or sense of fairness for the jury's.

AFFIRMED.


KING, Circuit Judge, dissenting:

With deference to my distinguished and able colleagues in the majority, I dissent from their affirmance of the district court's denial of the writ of habeas corpus. For the first time in my

35

fourteen years on this court -- during which I have participated in the decision of literally dozens of capital habeas cases -- I have serious reservations about whether the State has sentenced to death the right man.  My reservations are directly relevant to the two main constitutional claims that Kyles has raised -- an ineffective-assistance-of-counsel claim[20] and a <u>Brady</u> claim.[21]  Both claims are governed by a standard that asks whether there is a "reasonable probability" that, but for the constitutional infirmities at trial, "the result of the proceeding would have been different."  <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985) (citing <u>Strickland v. Washington</u>, 466 U.S. at 694).  A "reasonable probability" is one that is "sufficient to undermine confidence in the outcome."  <u>Id.</u>

An exhaustive examination of the entire record in this case was necessary to properly assess my degree of confidence in the verdict.  After such a review -- of both evidence introduced at trial and the evidence that should have been presented -- I conclude that Kyles has shown both that his trial lawyer was constitutionally ineffective and that the State failed to disclose material exculpatory and impeachment evidence.  Individually, and particularly when taken together, these two constitutional violations have undermined my confidence in the jury's verdict. Unlike the majority, I believe that, when the constitutional

---

[20] See <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

[21] See <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

36

violations in this case are considered, there is by no means "overwhelming evidence" of Kyles' guilt.

## I.

What follows is a detailed summary of the facts garnered from the record,[22] paying due deference to the Louisiana Supreme Court's opinion on direct appeal, the state trial court's findings of fact issued in denying Kyles' petition for state habeas relief, and the federal district court's findings of fact issued in denying Kyles' petition for federal habeas relief.[23]

### A. Events leading up to trial

At approximately 2:00 p.m. on Thursday, September 20, 1984, Dolores Dye, a sixty year-old white female, finished her shopping at a Schwegmann Bros. grocery store in New Orleans.[24] As she walked to her car in the store's parking lot, she toted a number of bags of groceries and her purse. According to police statements taken from eyewitnesses, after Mrs. Dye placed some or all of her groceries and her purse into the trunk of her red two-door Ford LTD, a young black man approached her and a struggle ensued, apparently over the keys to Mrs. Dye's car. The assailant wrestled her to the ground. When Mrs. Dye screamed and attempted to escape, the robber grabbed her arm, drew a small dark colored revolver from

---

[22] Except as specifically noted, all of the evidence discussed herein was adduced and thoroughly explored at the state court post-conviction evidentiary hearing.

[23] See 28 U.S.C. § 2254(d); FED. R. CIV. P. 52.

[24] Schwegmann Bros. is a large chain of grocery stores, many of which are located in New Orleans.

his waistband, and fired it into her left temple, killing her instantly.[25]  The gunman then took the keys from Mrs. Dye's hand, ran to her car, and drove away.

There were a number of eyewitnesses to the crime.  New Orleans police took contemporaneous witness statements from at least six persons, statements which were first provided in connection with the state court post-conviction evidentiary hearing.[26]  Almost all of the witnesses stated that the murderer was a black man with hair variously described as "platted," "in platts," or "braided," as distinguished from a combed-out "Afro" hair style.  Certain discrepancies in the various statements are notable.[27]

New Orleans police had no leads until the following Saturday, September 22, 1984 -- two days after the murder -- when Joseph

---

[25] The bullet was later determined to have been fired from a .32 caliber pistol.

[26] Those statements were taken from Edward Williams, Isaac Smallwood, Lionel Plick, Robert Territo, Willie Jones, and Henry Williams.  Of those persons, only Smallwood, Territo, and Henry Williams testified at trial.

[27] Isaac Smallwood described Mrs. Dye's assailant as "a black man . . . [about 17 or 18[.]  He was dark complexted [sic][.]  He had a light moustache, and braided hair.  The braids looked like they went down to his shoulders."  Lionel Plick described the assailant as being "about in his 20's[.]  He was about 5'10' tall, slender build . . . ."  Robert Territo similarly described the murderer as "about twenty-eight years old, close to six feet tall, slim build, dark skinned . . . ."  Willie Jones described Mrs. Dye's assailant as "a black male, about seventeen or eighteen years old[.]  He was about five feet-nine inches tall and weighed about one hundred and forty pounds.  He was dark skinned and his hair was platted."  Henry Williams described the assailant as "a black male, about 19 or 20 years old, about 5'4" or 5'5", about 140 to 150 lbs., medium build, dark complexion, his hair looks like it was platted, it was short."

"Beanie" Wallace[28] informed police investigators that he could supply them with a valuable lead in the Dye murder regarding a man only identified as "Curtis."[29] Detective Ray Miller and his supervisor, Sergeant James Eaton, met with Wallace at approximately 11:00 p.m. in the same general neighborhood where the murder occurred. In a lengthy tape-recorded conversation[30] that was first made known to the defense during the state court post-conviction proceedings, Wallace told Miller and Eaton that he (Wallace) lived with Curtis' brother-in-law, whom Wallace repeatedly described as his "partner."[31] According to Wallace, on the previous day, Friday, September 21, 1984, he had purchased a red Ford LTD from Curtis for $400 at approximately 6:00 p.m. Wallace stated that Curtis had not confessed to the murder and, in fact, had never even told Wallace that the car was stolen. However, Wallace stated that his relatives had informed him that the local newspapers and television had reported the Dye murder and had also shown pictures of the red Ford. Hence, Wallace stated, this discovery prompted him to contact the police.[32] In response to police questioning, Wallace

---

[28] In his conversation with the police, Wallace assumed one of his various aliases, "Joseph Banks."

[29] "Curtis" was later identified as Curtis Lee Kyles.

[30] Wallace was not aware that the conversation was being recorded.

[31] That person was later identified as Johnny Burnes, the brother of Curtis Lee Kyles' common-law wife or girlfriend, "Pinkie" Burnes.

[32] In their habeas corpus pleadings, the State has claimed that Wallace had previously served as a police informant; however, the tape-recorded conversation reveals that the New

39

described Curtis as a tall, "real skinny" black man, approximately twenty-five years old, "with a bush" hair style.[33]

Wallace also claimed that on the same Friday, he, Curtis, and Curtis' brother-in-law had unloaded numerous bags of Schwegmann Bros.'s groceries and a woman's brown purse from the stolen red car's back seat and trunk. According to Wallace, they then placed the items in the home of Curtis' common-law wife, "Pinkie" Burnes, where Curtis frequently stayed.[34] Wallace claimed that they later went to Schwegmann Bros.'s parking lot at approximately 9:00 p.m. on Friday in order to retrieve Kyles' automobile, which Wallace

---

Orleans police not only were unaware of Wallace's true name but also of his criminal history. In response to police questioning, Wallace claimed that he had been arrested only once, for "fighting." In fact, as was revealed at the state court post-conviction hearing, Wallace had been convicted as an accessory to another robbery/murder in New Orleans in the early 1980s. The habeas record also contains a transcript of a police interview with Wallace that was recorded four days after Curtis Lee Kyles was sentenced to death for the murder of Dolores Dye. In that statement, Wallace confesses that he participated in an unrelated 1984 robbery/murder of an elderly woman in her New Orleans home. Wallace admitted that it was his handgun that was used to kill the other woman, but denied that he was the triggerman. Wallace was never prosecuted for his involvement in that murder.

[33] At one point in the conversation, Wallace described Curtis as wearing a "bush" generally; he also specifically described Curtis as wearing a "bush" on the day on which Curtis allegedly sold the car to Wallace. In response to specific police questioning, Wallace also stated that Curtis would sometimes wear his hair in plaits.

[34] At trial, numerous witnesses referred to the relationship as a common-law marriage. Kyles is also the father of five of Pinkie Burnes' children. Although he often spent the night at other locations, Kyles spent a substantial portion of his time before his arrest cohabitating with Pinkie Burnes at the apartment which she leased.

40

described as an orange Ford.[35]   Wallace further stated that "I betcha I can get in a lot of trouble with this shit, huh," to which the police officers responded by repeatedly assuring Wallace that he would not be arrested and that, to the contrary, Wallace had done "the right thing."  Wallace stated that his fear stemmed from the fact that he had been seen driving Mrs. Dye's car on Friday night through the French Quarter of New Orleans.  Wallace also admitted that he had changed the license plates on Mrs. Dye's car.[36] Later in the conversation, Wallace became more confident, reminding the police that "I ain't doing all this for nothing, you know." The police responded by repeatedly promising that Wallace would not lose the $400 that he claimed he paid for the car as a result of the police's confiscation.

Also noteworthy in the tape-recorded conversation was Wallace's eagerness to help the police build a case against Curtis Lee Kyles.   Wallace stated that Kyles regularly carried two handguns, a .32 and a .38 caliber.   Wallace admonished Detective Miller that "*if you can set him up good*, you can get the same gun"

---

[35] At trial, there was evidence that Kyles in fact owned a rust-colored Mercury.

[36] Although the State, at trial and afterwards, has consistently disputed that Wallace in fact changed the plates, the tape recording makes it clear that Wallace did change the plates.  In response to a question from Detective Miller asking "[y]ou changed the plates on it, huh," Wallace sarcastically responded "[y]ou never know."  Later in the conversation, Detective Miller repeatedly informed other police officers that "[h]e changed the plate" -- statements in which Wallace fully acquiesced.  Furthermore, as discussed, <u>infra</u>, in a subsequent conversation between Wallace and the chief trial prosecutor, Cliff Strider, Wallace again admitted that he had changed the plates.

that was used to kill Mrs. Dye. (emphasis added).  Wallace also accompanied the police to Schwegmann Bros., where Wallace showed police the location where Curtis had supposedly parked his car, which was not retrieved until the day after the murder, according to Wallace.  Wallace specifically pointed out that the car was parked "on the same side where the woman was killed at."  He also claimed that Curtis "had a brown pocketbook" or "purse"[37] that he retrieved from the bushes at Schwegmann Bros.  Wallace pointed to bushes where Curtis had allegedly retrieved the purse.  Wallace claimed that "he's [Curtis] got it . . . at home [in a] chifferrobe [sic]."  Wallace informed Sergeant Eaton that Curtis' "garbage goes out tomorrow" and "if [Curtis] is smart he'll put [the purse] in [the] garbage."[38]

---

[37] Wallace originally referred to it as "pocketbook" but, when asked by the police, stated that it was in fact a "purse . . . like a purse."  I observe that the record contains a photograph of a single brown leather woman's handbag, which was identified as belonging to Mrs. Dye.

[38] On the tape itself, Sergeant Eaton actually makes the statement -- quoting Beanie Wallace -- in response to a question from Detective Miller.  Wallace's actual statement is inaudible due to intense static.  Eaton's quoting Wallace, however, is apparent from the tape.  Moreover, at the state court post-conviction evidentiary hearing, Eaton testified as follows in response to questions from Kyles' state habeas counsel:

Q. Do you have any recollection now as to why you [said] you had reason to believe the victim's [personal effects] would be in the trash?

A. I sure do.

. . .

Q. What it that?

A. . . . The subject Detective Miller had interviewed

42

Wallace was then taken to police headquarters where he was again interviewed by New Orleans police, this time by Detective John C. Miller.[39]  The written statement, which was not disclosed by the State until the state court post-conviction proceedings, indicates that the interview began at 12:55 a.m., Sunday, September 23, 1984.  The statement repeats the essentials given earlier, but one portion, which concerns Wallace's version of events on Friday night, merits full quotation:

> Curtis had called his brother-in-law, Claude Burn[e]s, they call him John.  I took a ride with Claude over to Curtis' house on Desire Street.  We went inside and Calude [sic] went in the back of the house to talk to Curtis' old lady[,] Pinkie [Burnes, Johnny Burnes' sister].  Then he came and we took another ride to Mazant St.  That's where Curtis was with the car.  . . . [Curtis] was standing next to the car, [and] he asked me if I wanted to buy it and he gave me the keys.  See, I was supposed to buy his car, but he said that he wanted to sell me the [red] ford because he was going to give it to his old lady, but he got mad at her and wanted to sell it.  I was going to give him the four hundred dollars for his car but I like the ford better so he sold me that

---

[i.e., Wallace, assuming the alias "Joseph Banks"] see[n] Curtis Kyles with a purse.  I had asked him [about] the disposition of the purse, what [did] Curtis do with the purse.  . . . He says, "He probably threw it away."  . . .  He suggested that probably he'd throw it in his garbage . . . .

Q. When you say "he," you mean Beanie?

A. Beanie had suggested that Curtis probably would throw it away in his garbage.  I made the statement, to my knowledge, which is transcribed, telling Detective Miller when he asked me what he did say -- Detective Miller had removed himself from the car and was searching the area.  He [Miller] asked me what did he [Beanie] say, and I said "He said he'd probably throw it in the garbage . . . ."

[39] Detective John C. Miller and Detective Ray Miller are apparently different persons.

43

one.  He asked me to help him unload the ford, because he
had grocery's in the Schwegmann bags in the trunk and on
the back seat.  We took the spare tire out and the jack
and put it in his car.  After we took everything out he
took a brown purse out of the ford, from the front seat.
He said that it was his old lady's purse.  Then I got in
the ford and I drove over back to his house on Desire St.
[H]e rode with some friends of his to his house and we
met on Desire by his house.  That's when I helped him
unload his car and bring the grocery's inside his house.
. . . After that I just left. [sic passim].

Wallace then reiterated his claim that approximately three hours later, at 9:30 p.m. on the same Friday night, Curtis "called his brother-in-law" at the residence "where I stay and I went for the ride.  We went to Curtis' house and picked him up and went back to Schwegmann . . . [to] pick up his car, because he said that it didn'[t] want to start. . . .  It was in the Schwegmann's parking lot . . . [where] he picked up a pocket book he had by the building.  [I]t was a big brown pocket book."

In a third pre-trial interview -- between the State's chief trial prosecutor, Cliff Strider, and Wallace -- Wallace's version of the events of Friday, September 22, 1984, had changed again.[40] Like the other two statements, this one was not disclosed to the defense until Kyles' conviction and death sentence had become final.  Rather than allegedly picking up Curtis Kyles' car from the Schwegmann Bros.'s parking lot on Friday, Wallace claimed that he,

---

[40] The precise date of this interview is unknown, but apparently it occurred around the time of the two trials in late 1984.  It is undisputed that the interview in fact happened.  At the state court post-conviction hearing, Kyles' counsel offered into the record the five pages of notes, which were discovered in the New Orleans District Attorney's file and which were identified as having been written by the State's chief trial prosecutor, Cliff Strider.

44

Curtis, Johnny Burnes, and another man (identified as "Black")[41] drove to the supermarket parking lot on *Thursday*, in the early evening.[42]  That is, in the third interview, Wallace claimed that they retrieved Kyles' car during the early evening of the same day Mrs. Dye was murdered.  Strider's notes then recount that at approximately 7:45 p.m.,[43] the group drove to "Black's house" where Kyles, Black, and Johnny Burnes supposedly left Wallace in the car and proceeded to go inside.  Approximately ten minutes later, according to Wallace, the others returned carrying groceries and a brown purse.  The group then returned to Pinkie Burnes' apartment, where the groceries were unloaded once again.  After a night of drinking and smoking marijuana, the group allegedly broke up around midnight.

The next portion of Strider's notes are subtitled "Friday" and begin at "11:00," presumably 11:00 a.m. from the context of the notes.  It is then, according to this version of Wallace's statement, that Curtis allegedly sold the red Ford to Wallace.  The notes state that Wallace spent the remainder of the day and most of the night driving around New Orleans.  Wallace returned to the home

---

[41] At trial, one of the defense witnesses was named Kevin Black, who, the prosecution argued, assisted Kyles, Wallace, and Johnny Burnes in retrieving Kyles' car from Schwegmann Bros.

[42] Strider's notes indicate that the group drove to Schwegmann Bros. between 5:00 and 7:30 p.m.

[43] Strider's notes do not specify a.m. or p.m., but presumably refer to 7:45 p.m., as is apparent not only from the context of the notes but also from a reference to the term "dark" written next to "7:30-7:45."  Furthermore, Mrs. Dye was not murdered until 2:20 *p.m.* on Thursday.

45

at which he was staying at approximately 4:00 a.m. Saturday morning.

The next portion of the notes are subtitled "Saturday" and begin at 10:00 a.m. Wallace recounted that he changed the license plates on the car that morning. By that afternoon, Strider's notes state, "B[eanie] put everything together." He then "called Miss Williams," who was apparently a contact at the New Orleans Police Department. By approximately 9:00 p.m., Wallace met with Detective Ray Miller and Sergeant Eaton -- which comports with the contents of the undisclosed tape (discussed supra). Strider's notes then refer to the second police interview that ended early Sunday morning, at approximately 2:30 a.m. (discussed supra).

The next portion of Strider's notes are subtitled "Sunday" and begin at noon (12:00 p.m.), when the notes refer to a call from "Miss Williams" to Wallace. Williams "asked about gun -- B[eanie] said he will find out -- B[eanie] will call back." The notes then state that Wallace went to Pinkie Burnes' apartment from approximately 2:00-5:00 p.m. After leaving for approximately two hours, Wallace returned for a "Sunday dinner" at Pinkie Burnes' apartment; a number of other persons attended the dinner, including Curtis Kyles and Kevin Black.[44]  At approximately 9:30 p.m. on

_____

[44] Curiously, the State has consistently disputed whether in fact such a "dinner party" took place. However, Strider's handwritten notes support Kyles' claims about the dinner party. Strider's notes state that Wallace recounted that on Sunday, September 23, 1984, Wallace "[w]ent to Pinky's about 7 [o'clock]." The statement recounts that Wallace and various other people, including Kyles and Pinkie Burnes, ate dinner. "[A]bout 9:00" Beanie left. I observe that at trial, police Detective John Dillman, who was in charge of the New Orleans

46

Sunday night, Wallace departed and met with Detective Miller at approximately 10:00 p.m. The two drove around "trying to pass time till [the] garbage [was] put out" at Pinkie Burnes' apartment; they "circled road till about 3:00 a.m." As will be discussed in greater detail below, the New Orleans police picked up the garbage before dawn.

Included in the state habeas record are New Orleans Police Department memoranda concerning the seizure of the garbage in front of Pinkie Burnes' apartment in the early morning hours on Monday, September 24, 1984. These documents were not disclosed to the defense until the state court post-conviction proceedings. One of those memoranda, from Sergeant James Eaton to Sergeant Dave Morales, states that "[w]e have reason to believe that the victims [sic] personal papers and the Schwegmann's bags will be in the trash." As discussed supra, during the original conversation between Wallace and the police, Wallace informed Sergeant Eaton that, "if [Curtis] is smart, he'll put [Mrs. Dye's purse] in the garbage." At the state habeas evidentiary hearing, Sergeant Eaton admitted that the phrase "we have reason to believe" used in the memo specifically referred to Beanie Wallace's "tip" about the garbage. After police seized the garbage, a brown handbag containing various personal effects of Mrs. Dye was discovered in

Police Department's investigation of the Dye murder, testified under oath that he knew nothing of the defense's claim that Beanie Wallace came to Pinkie Burnes' apartment for a Sunday dinner. Assistant DA Strider, who was present during that testimony, said nothing in response to Dillman's answer.

47

the rubbish, along with numerous Schwegmann Bros.'s bags.

Curtis Lee Kyles was arrested outside Pinkie Burnes' apartment late Monday morning. Police proceeded to execute a search warrant of the residence. They recovered a .32 caliber revolver, which was later determined to be the murder weapon, hidden behind the stove in the kitchen. Police also recovered various types of ammunition, including sixteen .32 caliber shells that were of the same brand as the shells in the pistol. Also recovered was what appeared to be a home-made holster for a pistol in the wardrobe in the bedroom.[45] Under the sink, the police discovered eight Schwegmann Bros.'s brown paper bags. In a kitchen cabinet, police also seized cans of three popular brands of dog and cat food similar to the brands normally purchased by Mrs. Dye (according to the trial testimony of Mrs. Dye's husband). Mrs. Dye's fingerprints were not found on any of the cans of pet food. Kyles' prints were not found on the .32 caliber revolver, the brown handbag, or in or on Mrs. Dye's red Ford LTD. However, Kyles' prints were found on a Schwegmann Bros.'s small receipt found in the red Ford LTD, although in the process of lifting the fingerprints, chemicals used by the police destroyed the face of the receipt.[46] A second Schwegmann Bros.'s receipt was also found in the trunk of Mrs. Dye's car, although Kyles' fingerprints were not found on that receipt.

---

[45] This wardrobe possibly was the "chifforobe" to which Wallace referred in his September 22 statement.

[46] The police failed to record the contents of the printed matter on the receipt.

**B. The trials**

In late November of 1984, Curtis Lee Kyles was put on trial for the capital murder of Dolores Dye. Kyles professed his innocence and supplied an alibi -- claiming that he was picking up his children from school -- and offered supporting witnesses. The entire theory of the defense was that Joseph "Beanie" Wallace had framed Kyles by planting evidence in Pinkie Burnes' apartment and garbage. Wallace's alleged motive was three-fold: first, that Wallace, who admittedly had been seen in possession of the victim's car, wished to shift the blame to Kyles; second, that Wallace had romantic aspirations regarding Kyles' common-law wife, "Pinkie" Burnes; and, third, that Wallace wished for reward money. The heart of the State's case was positive eyewitness testimony from four persons who were at the scene of the crime, although the State also relied on a number of pieces of circumstantial evidence.[47] Notably, Joseph "Beanie" Wallace did not testify as a witness for either the defense or the prosecution. After four hours of deliberation, Kyles' jury became deadlocked on the question of guilt, and a mistrial was declared.

In early December, a second trial occurred. Again, the heart of the State's case was the unshaken testimony of four eyewitnesses who positively identified Kyles in front of the jury. Again, the theory of the defense was that the eyewitnesses were mistaken in

---

[47] Police further testified that three of those eyewitnesses had also picked Kyles out of a pre-trial photo line-up.

their identification of Kyles. Further, as the Louisiana Supreme

Court recounted in its opinion on direct appeal:

> The defense presented several witnesses who saw Wallace in a red car similar to the victim's about an hour after the killing. Other witnesses testified that Wallace had attempted to sell the car shortly after the murder. One witness observed Wallace stooping down near the stove in defendant's home the day before the gun was found behind the stove by the police. There was further testimony that Wallace and defendant resembled each other. Additionally, the defense presented testimony that Wallace was very romantically interested in Martina "Pink[ie]" Burns, defendant's [common-law wife] and the mother of defendant's [five] children.

> Finally, defendant took the stand and testified without contradiction that he had no prior convictions. Denying any involvement in the shooting, he explained his fingerprints on the cash register receipt [found in Mrs. Dye's car] by asserting that Wallace had picked him up in a red car [on Friday, September 21, 1984] and had taken him to Schwegmann's, where he purchased transmission fluid for his car and a pack of cigarettes. He suggested that the receipt may have fallen from the bag when he removed the package of cigarettes. . . .[48] [T]here was also testimony that defendant's family kept a dog and cat and often fed stray animals in the neighborhood.

> On rebuttal, the prosecutor had Wallace brought into the courtroom. Each of the eyewitnesses, after viewing Wallace standing next to defendant, reaffirmed previous identifications of defendant as the murderer.[49]

---

[48] I have been unable to locate the receipt in the record, although the statement of the facts indicates that it was admitted as a State's exhibit at trial. I observe that, at trial, the judge repeatedly referred to the receipt as "a small piece of paper." Furthermore, at oral argument, Kyles' habeas counsel represented to the court -- without contradiction by the State -- that the receipt was approximately 2" x 2".

[49] The state court neglected to mention that the prosecution also offered a blown-up photograph taken at the crime scene soon after the murder. Prosecutors argued that a medium to dark colored automobile in the background of the photograph was Kyles' own car. Prosecutors repeatedly argued during cross-examination of defense witnesses that Kyles had left his own car at Schwegmann Bros. on the day of the murder and had retrieved it later. The prosecution offered no evidence or witnesses to

Kyles, 513 So.2d at 266-67.

Once again, Wallace did not testify for either the State or defense.

## C. Evidence that has subsequently come to light

During the state court post-conviction evidentiary hearing, Kyles' able habeas counsel, who replaced the defense attorney who had handled the trial and direct appeal, offered a number of items of new evidence that were discovered in the files of the New Orleans police and District Attorney's Office. It is undisputed that this evidence was not made available to the defense at the time of trial. Such evidence may be summarized as follows:

i) Six contemporaneous eyewitness statements taken by police following the murder (discussed supra);

ii) A tape recording of the lengthy conversation between Wallace and New Orleans police officers that occurred late in the evening on Saturday, September 22, 1984 (discussed supra);

iii) A typed and signed statement given by Wallace to another New Orleans police detective early in the morning of Sunday, September 23, 1984 (discussed supra);

iv) Hand-written notes of an interview of Joseph "Beanie" Wallace conducted by Cliff Strider, the chief trial prosecutor (discussed supra); and

v) A computer print-out of license plate numbers on cars parked in the Schwegmann Bros.'s parking lot recorded by New Orleans police at approximately 9:15 p.m. on September 20, 1984, the night of the murder.[50]

_____

support this argument besides the blown-up photograph.

[50] Another item of somewhat less significance was revealed at the state court post-conviction evidentiary hearing -- a copy of an internal New Orleans police memorandum dated "9-20-84" (i.e., Thursday, the same day as the murder). The memo states

In support of Kyles' Brady claim,[51] Kyles' state habeas counsel offered a copy of the lengthy pre-trial motion filed by Kyles' trial counsel, who requested that the State disclose any exculpatory or impeachment evidence. Witness statements were among Kyles' requests. In its response to that motion, the prosecution based its denial on the claim that there was "[n]o exculpatory evidence."

## II.

On appeal from the district court's denial of the writ of habeas corpus, Kyles raises two main claims: the aforementioned Brady claim and a somewhat related ineffective-assistance-of-counsel claim. I will address these two issues in turn. However, because the critical issue of "materiality" in this court's Brady analysis is governed by a standard identical to that governing the

---

that a New Orleans citizen who had apparently heard about the murder reported that, at approximately 7:00 p.m., a "bright red 1980-1983 Thunderbird" in the French Quarter drove into a parking meter and then swerved away. (Mrs. Dye's car was a bright red 1980 Ford LTD, which strongly resembles a Thunderbird; indeed, as discussed infra, at least one of the eyewitnesses to the murder originally described Mrs. Dye's car as a Thunderbird.) The citizen described the driver as "a negro male, 25 years of age, 5'10" - 5'11" with short hair." The driver stopped and asked the citizen if he wanted a ride, which was declined. The citizen observed a "small bluesteel [i.e., dark metal, as opposed to nickel] revolver on the seat." Notably, in his various statements to police, Beanie Wallace admitted driving Mrs. Dye's car around New Orleans, including the French Quarter, although he claimed on Friday rather than on Thursday night. Wallace also stated that at one point that weekend he "pulled out and hit [a] fence -- scratched on the passenger side." As discussed infra, Wallace's chronology of events between Thursday and Sunday significantly changed in each of his various statements given to police.

[51] Brady v. Maryland, 373 U.S. 83 (1963).

52

"prejudice" prong of the two-prong ineffectiveness analysis required by Strickland v. Washington,[52] I will address the Brady "materiality" and Strickland "prejudice" issues together after separately analyzing the first prongs of the Strickland and Brady standards.[53]

## A. Strickland's first prong: Was trial counsel deficient?

Under Strickland v. Washington, in order to prevail in raising a claim of ineffective assistance of counsel, a criminal defendant must make two separate showings: first, that counsel was "deficient," that is, that counsel did not provide "reasonably effective assistance"; and, second, that trial counsel's deficient performance "prejudiced" the defendant. See id. 466 U.S. at 687-98. As noted, I will limit my discussion here to the first prong of Strickland.

Of all of Kyles' specific allegations of ineffective assistance on the part of his solo trial counsel, Martin Regan, I believe that counsel was deficient in only one way, albeit a particularly important way: Regan not only failed to call Joseph

---

[52] 466 U.S. 668 (1984).

[53] Compare United States v. Bagley, 473 U.S. 667, 682 (1985) ("The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome."), with Strickland v. Washington, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

"Beanie" Wallace as a defense witness, but even failed to interview

him.  At the state court post-conviction evidentiary hearing, Regan

repeatedly testified that the only reason he failed to call

"Beanie" Wallace to the stand at trial or even interview him was

because Regan mistakenly believed that, under Louisiana evidence

law, he would have had to vouch for Wallace's credibility -- and

thus could not impeach Wallace or ask him leading questions --

unless Regan could show *both* surprise *and* hostility on Wallace's

part.  With respect to this claim, the state trial judge found

that:

> Much has been made of Mr. Regan's opinion that he failed
> miserably in his defense of Mr. Kyles when he chose not
> to call Joseph Wallace as a witness.  Mr. Regan stated
> that he incorrectly viewed the law as saying that if
> Joseph Wallace was called as a [defense] witness he would
> have had to vouch for his credibility unless he could
> have shown hostility and surprise on the part of Mr.
> Wallace at the time that Mr. Wallace testified. *This was
> the law of Louisiana at the time of both Mr. Kyles'
> trials.*  . . . The law of Louisiana has subsequently been
> amended . . . *But at the time of Mr. Kyles' trial, under
> existing law, Defense counsel certainly made an
> intelligent and strategically correct decision not
> placing Mr. Wallace on the stand as a defense witness.*
> (emphasis added).

The federal district court agreed that Regan's failure to call

Wallace was a reasonable strategic decision in view of Louisiana

law as it then existed.[54]  I reject the conclusions of both the

---

[54] The district court disagreed with the state trial court's
conclusion that *both* hostility and surprise were required.
However, the district court questioned whether Wallace would have
been a "hostile" witness under Louisiana law.  The district court
based this conclusion on the testimony of Cliff Strider, the
chief trial prosecutor, who testified at the state court post-
conviction evidentiary hearing that "I told him [Regan] that I
didn't think Beanie would get hostile.  I didn't think Beanie
would be upset."  Thus, the district court held, "this court

state trial court and federal district court.  As I discuss below, I accept instead the conclusion of the Louisiana Supreme Court.

At the time of trial, the plain language of the applicable state evidence rule was as follows: "No one can impeach his own witness, unless he has been taken by surprise by the testimony of such witness *or* unless the witness shows hostility toward him, and even then, the impeachment must be limited to evidence of prior contradictory statements."  LOUISIANA REVISED STATUTES 15:487 (emphasis added).  Thus, as a matter of state law, the state trial court was mistaken.  With respect to the federal district court's additional conclusion that Regan made a "strategic" choice not to put Beanie Wallace on the stand on the ground that he likely would not prove to be "hostile," I would reject this finding as clearly erroneous.

My basis for rejecting the federal district court's finding is the opinion of the Louisiana Supreme Court in State v. Kyles, 513 So.2d at 273: "Wallace was clearly a witness hostile to the defendant, and defense counsel was entitled to employ leading questions and to impeach the witness through any prior inconsistent statements. . . .  Defendant's argument that he would have been required to show both hostility *and* surprise is clearly wrong."[55]

---

believes that Regan made a tactical decision that was reasonable and well advised at the time that he decided not to place Beanie on the stand."

[55] In making these observations, the state high court was not addressing a claim of ineffective assistance of counsel. Rather, on direct appeal, Regan (who remained Kyles' counsel until his conviction was affirmed) raised an unrelated claim in which he coincidentally displayed his misunderstanding of

In reliance on the opinion of the highest expositor of state law in Louisiana, I believe that Regan was deficient in failing to call Wallace to the stand because of a "clear" misunderstanding of a single, basic rule of evidence. Regan's *entire* strategy at trial was to argue that Wallace framed Kyles; his failure to call Wallace, who was present at trial and available to testify, was anything but "strategic."

The majority, agreeing in part with the district court, holds that Kyles' trial counsel made a "strategic" choice not to call Wallace to testify (or even interview him) because Wallace was a potential "loose cannon" whose testimony would have been a "double-edged sword" because Wallace "would almost certainly would have inculpated Kyles." Majority Opinion, slip op., at pp.32-33, ___ F.2d at ___. Thus, the majority reasons, trial counsel was not deficient under <u>Strickland</u>. I can only response by agreeing with the majority that I have no doubt that Wallace would have attempted to inculpate Kyles. But that is of no moment. The entire purpose of calling Wallace would have been to expose his leading role in the development of the prosecution's case, to impeach him and, in the process, to accuse him of framing Kyles and suggesting that Wallace had some role in the murder. One would hardly expect Wallace not to have attempted to inculpate Kyles. The majority simply misses the point.

---

Louisiana evidence law on the issue of hostile witnesses called by a party. The Louisiana Supreme Court, in rejecting that claim, noted Regan's "clear" misunderstanding of the law. The Louisiana Supreme Court's conclusion applies just as forcefully to the ineffectiveness claim.

**B. The <u>Brady</u> claim: Suppression and Favorableness?**

A <u>Brady</u> violation occurs where: (1) the government suppressed evidence; (2) the evidence was "favorable" to the defendant; and (3) the evidence was "material" to issues at trial. <u>See</u> <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39 (1987); <u>Bagley</u>, <u>supra</u>; <u>United States v. Agurs</u>, 427 U.S. 97 (1976); <u>Brady</u>, <u>supra</u>. Favorable evidence includes both exculpatory and impeachment material. <u>Bagley</u>, 473 U.S. at 676. The <u>Brady</u> doctrine applies equally to situations where a specific request, general request, or no request is made by the defense for particular favorable information. <u>Id.</u> at 682; <u>see</u> <u>also</u> <u>Kirkpatrick v. Whitley</u>, 992 F.2d 491 (5th Cir. 1993). Furthermore, the <u>Brady</u> materiality standard applies equally to undisclosed evidence relating to the guilt/innocence and punishment stages of trial, <u>see</u> <u>Brady</u>, 373 U.S. 83 (1963), including in capital cases, <u>James v. Whitley</u>, 926 F.2d 1433, 1437 (5th Cir. 1991).

After an evidentiary hearing at which the defense offered all of the above-mentioned items of evidence that were not disclosed at trial, the state trial court, in its findings of fact and conclusions of law, rejected Kyles' <u>Brady</u> claim:

> The Court finds no merit to [sic] any of the Defense allegations . . . regarding violations of Brady versus Maryland . . . . Assuming, arguendo, that certain background information concerning and statements of Joseph Wallace were withheld by the State[,] this Court finds that this [was] not ultimately prejudicial to the Defense. The Court concludes that none of the evidence would have ultimately assisted the Defense to any significant degree in this case. It is important to note that Joseph Wallace was never called as a witness by the State. As such, there never could be an attempt by the

57

defense to attack the character and credibility of Mr. Wallace. Hence, the State never sought to vouch for the credibility of Mr. Wallace. As such, there would be no basis for the attempted impeachment of Mr. Wallace by the Defense. It should be further noted that the Defendant was given ample opportunity, and successfully placed before the jury through credible evidence, the basic premise of the Defense's case, that Joseph Wallace was in fact the killer of Mrs. Dye and that Joseph Wallace "framed" the defendant for [sic] this killing. The Defense even went so far as to present evidence of possible bias and motive[,] i.e., Wallace's desire to gain the affection of Curtis' Kyles' female acquaintance -- by having Kyles convicted of this crime and thereafter incarcerated. The jury was more than adequately exposed to the possibility that Joseph Wallace was in fact the killer. They were aware that he was in fact in possession of the victim's car shortly after her murder. The jury was likewise given the opportunity to see Mr. Wallace in person as he was brought into open court at the behest of the State. He was made to literally stand before the jury. At the same time the jury was afforded the opportunity to compare his height, his size, his physical characteristics to those of the defendant. . . . This Court finds that the new evidence . . ., even if presented to another jury, would not in any way lead to a different outcome of this case.[56]

The federal district court likewise rejected Kyles' Brady claim. The court held that none of the alleged Brady evidence even met the second prong of the Brady test -- that is, that such evidence be "favorable" to the defense on the issues of guilt or punishment. The September 22, 1984 tape-recorded conversation between Wallace and New Orleans police, according to the district court, "does not exculpate Kyles." The court also stated that Kyles' characterization of the contents of the tape "is not a fair

---

[56] The state trial court failed to address many particulars of Kyles' multi-faceted Brady claim, which were raised either in Kyles' state habeas petition or at the extensive state post-conviction evidentiary hearing. See infra. The Louisiana Supreme Court, by a vote of five to two, affirmed the trial court's denial of habeas relief.

rendition of the material contained in the tape itself."[57]

With respect to the police's computer print-out of the license

numbers in Schwegmann's parking lot on the night of the murder, the

district court held that because a New Orleans police officer had

testified at the state court evidentiary hearing that the list was

incomplete, the list "would have carried little if any exculpatory

weight and bears so little on materiality that it fails to fit the

---

[57] In reaching this conclusion, the court noted, "Kyles alleges that had he had the tape recording he would have learned that:

> 1) Beanie knew in what area of Schwegmann's parking lot the murder was committed;
> 2) Beanie had said that Kyles wore a `bush' hairstyle in contrast to testimony that the killer had `plaits';
> 3) Beanie asked for $400 for the purchase price of the victim's car and was assured by police that he would be paid;
> 4) Beanie suggested to police that Kyles might put incriminating evidence in his garbage; and
> 5) Beanie feared apprehension because he had been seen driving the Dye automobile."

I reject the district court's conclusion that Kyles' "characterization" of the contents of the tape "is not a fair rendition of the material contained in the tape itself."  I have repeatedly listened to the tape, have compared it to the transcript of the recording offered by Kyles' counsel, and agree with Kyles' characterization regarding each of the above five points.  The characterization of whether certain undisclosed evidence is "favorable" to the defense (a prerequisite to a finding of "materiality" under Brady) is a mixed question of fact and law, which is reviewed de novo on appeal, rather than a pure factual finding.  See United States v. Rogers, 960 F.2d 1501, 1510 (10th Cir. 1992) (citing cases); United States v. Phillip, 948 F.2d 241, 250 (6th Cir. 1991); United States v. Rivalta, 925 F.2d 596, 598 (2d Cir. 1991).  Thus, the district court's legal conclusion is owed no deference and is reviewed de novo on appeal.  Even assuming that the district court's conclusion regarding Kyles' "characterization" of the contents of the tape recording were a "pure" finding of fact, I would reject that finding as clearly erroneous.  Finally, I observe that the majority does not appear to dispute Kyles' characterization of the contents of the tape recording.

59

Brady mold." With respect to the police memoranda regarding the garbage collection, the court stated that even if Beanie were the source of the tip about the garbage, "the bags that were picked up were identical, which renders improbable, if not impossible, the defense's argument that Beanie planted a bag of garbage." Regarding Smallwood's inconsistent witness statement, the district court conceded that Smallwood's trial testimony appeared "embellished," but summarily held that there was no "prejudicial error." After stating that "[a] complete reading of the record convinces this court of Kyles' guilt and that he received a fair trial," the district court rejected Kyles' Brady arguments.

On appeal, Kyles once again advances his Brady claim. Kyles points to: i) Beanie's various undisclosed contradictory statements; ii) Isaac Smallwood's contemporaneous witness statement that conflicted with his trial testimony; iii) the computer print-out of license plate numbers; and iv) the police internal memoranda regarding the seizure of garbage.

As an initial matter, I address the contention that has been made by the state trial court judge and the State pertaining to the fact that the trial prosecutors -- as opposed to the New Orleans police -- may not have been aware of some of this evidence at the time of trial. If this were indeed true,[58] it would nevertheless

_____

[58] I find the State's claim that the various items in the police file were not even made available to the prosecution until long after trial to be highly implausible; indeed, the State's claim here suggests that the State is not being candid with the court. The State has claimed that the various statements of the eyewitnesses, the three statements of Beanie Wallace, and the police memoranda were not available -- to the prosecution *or*

60

be irrelevant.  The <u>Brady</u> doctrine is not limited to prosecutors; rather, it includes *all* members of the "prosecution team," which includes all law enforcement officers who have worked on the case and thereby contributed to the prosecutorial effort.  <u>See</u> <u>Schneider v. Estelle</u>, 552 F.2d 593, 595 (5th Cir. 1977) ("The petitioner . . . allege[s] that Nicholson was a state law enforcement officer.  As such, he was a member of the prosecution team."); <u>see</u> <u>also</u> <u>United States v. Buchanan</u>, 891 F.2d 1436, 1442-43 (10th Cir. 1989) (citing cases); <u>United States v. Endicott</u>, 869 F.2d 452, 455 (9th Cir. 1989) (citing cases); <u>United States ex rel. Smith v. Fairman</u>, 769 F.2d 386, 391 (7th Cir. 1985).  In a similar vein, the good faith or bad faith of the prosecution has no bearing on the due process required by <u>Brady</u>.  <u>Brady</u>, 373 U.S. at 87.  Accordingly, "whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor."  <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972).

---

defense -- until long after trial because of "slow typing" by police typists.  <u>See</u> State's Brief, at p. 29.  The claim was repeated at oral argument.  However, the very documents that supposedly were typed long after the fact entirely belie the State's claim.  All of the contemporaneous eyewitness statements, which were typed, were *signed and dated* by the various eyewitnesses in the immediate wake of the murder.  Likewise, Beanie Wallace's second statement, which was typed, was *signed and dated* by Wallace on September 23, 1984 -- three days after the murder.  I simply cannot accept the proposition these various typed documents were back-dated and signed after trial.  Furthermore, Beanie Wallace's third statement, which was memorialized in Assistant DA Strider's notes, obviously was available before trial.  And, finally, the original tape-recorded statement, which was never reduced to a hard copy until it was disclosed to the defense during the post-conviction proceedings, clearly was available, as it was on tape.  The State's claim that the tape was never listened to by the prosecution, while irrelevant, is likewise implausible.

That said, I agree with Kyles that all of these items of undisclosed evidence, particularly when considered cumulatively, would have been "favorable" to the defense at trial within the meaning of Brady.  The state trial court, whose opinion was affirmed by the Louisiana Supreme Court, and the federal district court concluded that the evidence was not favorable because of the supposedly overwhelming evidence of Kyles' guilt.  I disagree. Much of the Brady evidence in this case substantially detracts from the State's evidence and theories at trial.  The undisclosed evidence, as Kyles correctly argues, "fits hand in glove" with his theory of the defense advanced at trial.  Moreover, two of the undisclosed items -- contemporaneous witness statements by Isaac Smallwood and Henry Williams -- go to the reliability of the critical eyewitness testimony at trial.  Rather than further addressing here how each item of undisclosed evidence would have been "favorable," I necessarily will address that question in Part II.C., infra, in discussing the larger issue of materiality.[59]

## C. Brady "Materiality" and Strickland "Prejudice"
### i) Why the two claims must be evaluated in conjunction

Having determined both that Kyles' trial counsel was deficient by failing to call Beanie Wallace as a defense witness and that a

_____

[59] The majority opinion, unlike the district court and states courts, agrees that at least Beanie Wallace's tip to police about the garbage, discussed infra, was favorable. However, the majority holds that the totality of the Brady evidence, including Wallace's garbage tip, was not "material." As I discuss infra, I disagree with the majority on the question of Brady materiality.

considerable amount of evidence was both suppressed by the State and favorable to the defense, I next jointly determine: i) whether the evidence was "material" under Bagley; and ii) whether trial counsel's deficiency "prejudiced" Kyles under Strickland. I believe that the only appropriate way to analyze Kyles' case is to consider his ineffectiveness and Brady claims in conjunction. After all, the "materiality" prong of his Brady claim in a significant way directly relates to the "prejudice" prong of his ineffectiveness claim, and vice versa. Furthermore, as noted supra, the inquiry for both claims is identical: assuming, counter-factually, that Wallace had in fact been called as a defense witness and that trial counsel had been privy to all of the aforementioned Brady evidence, it must be asked whether there is a "reasonable probability" that the result of the guilt/innocence phase or punishment phase would have been different. A "reasonable probability" is one that "undermines confidence in the outcome." Bagley, 473 U.S. at 682; Strickland, 466 U.S. at 694.[60] The majority believes that there is no need even to engage in this joint Bagley/Strickland analysis because the majority holds that Kyles' trial counsel was not deficient for failing to call Wallace

---

[60] I note here that the majority opinion repeatedly speaks of applying the "harmless error" rule to Kyles' Brady claims. The majority seems unaware that Brady's progeny, in particular Bagley, have their own built-in test of "materiality" to determine whether any Brady violation was "harmful" to the defendant -- namely, whether the undisclosed evidence undermines confidence in the verdict. I thus see no need to respond to the majority's rather curious claim that any Brady violation was harmless under Brecht v. Abrahamson, 113 S. Ct. 1710 (1993).

to the stand.  See Majority Opinion, slip op., at p.22 n.10, ___

F.2d at ___ n.10.

## ii) Why my confidence in Kyles' guilty verdict and death sentence is undermined

Under Strickland and Bagley, this court must determine whether there is a "reasonable probability" that, but for the two constitutional errors working in conjunction, Kyles' jury, considering all of the relevant evidence, would not have unanimously found either that there was sufficient evidence to prove beyond a reasonable doubt that Kyles was guilty or that Kyles should receive a death sentence.[61]  The heart of the inquiry here is whether the constitutional infirmities rendered the proceeding

---

[61] Under Louisiana law, a single holdout juror during the punishment phase would have automatically resulted in a life sentence for Kyles.  See State v. Loyd, 459 So.2d 498, 503 (La. 1984) (as long as a single juror held out and voted for a life sentence, automatic life sentence under Louisiana law); see also LA. CODE CRIM. PRO. 905.8.  Although residual doubt is not a species of constitutionally relevant mitigating evidence, see Franklin v. Lynaugh, 487 U.S. 164 (1988), there is no question that residual doubt plays a significant role in leading a jury to impose a life sentence, see Lockhart v. McCree, 476 U.S. 162, 181 (1986) ("[A]s several courts have observed, jurors who decide both guilt and penalty are likely to form residual doubts or `whimsical doubts' . . . about the evidence so as to decide against the death penalty. *Such residual doubt has been recognized as an extremely effective argument against the death penalty.*") (citations and internal quotations omitted) (emphasis added).  Kyles' trial counsel accordingly argued that Kyles' sentencing jury should consider their residual doubt in assessing punishment.  In this regard, it is noteworthy that Kyles did not have any other aggravating factors supporting the imposition of a death verdict besides the fact that the murder for which he was convicted was committed in the course of a robbery.  And, finally, I note that Kyles lacked a significant prior criminal history, which is important mitigating evidence.  See Kyles v. State, 513 So.2d at 276.  The majority incorrectly states that Kyles had no mitigating evidence "other than his close relationships with his family."  Majority Opinion, slip op., at p. 13, ___ F.2d at ___.

*unreliable.* See Lockhart v. Fretwell, 113 S. Ct. 838, 842-43 (1993).[62] Looking at the totality of evidence in this case -- both that admitted at trial and that which should have been introduced -- my confidence in the jury's guilty verdict and death sentence is undermined. Bagley, 473 U.S. at 682; Strickland, 466 U.S. at 694.

In this section, I focus on five main factors that undermine my confidence in Kyles' guilty verdict and death sentence. They may be summarized as follows:

> (i) Kyles' first jury, hearing evidence essentially identical to that offered at the second trial, was deadlocked on the question of guilt;
>
> (ii) Beanie Wallace's various statements not only reveal numerous material inconsistencies that suggest that the State's informant was not credible, but also are directly exculpatory in numerous ways;
>
> (iii) the undisclosed contemporaneous witness statements not only undermine the eyewitness testimony at trial, but also contain information that suggests that Kyles was not the killer;
>
> (iv) the remainder of the Brady evidence is significant; and
>
> (v) the remainder of the State's case not only fails to support the prosecution's theory, but in fact bolsters the defense's theory.

My focus on these factors, particularly (ii)-(iv), chiefly concerns how a reasonably effective trial counsel would have used the Brady evidence had it been properly disclosed by the State. My analysis assumes that trial counsel would have utilized such

---

[62] Although Lockhart was an ineffectiveness case, its emphasis on reliability is equally applicable to Brady claims in view of Bagley's wholesale adoption of Strickland's "prejudice" requirement.

evidence to support the theory of the defense at Kyles' actual trial: namely, that Curtis Lee Kyles had nothing to do with Mrs. Dye's murder and that the eyewitnesses were mistaken or being untruthful; that Beanie Wallace "framed" Kyles not only by falsely informing police that Kyles had sold Mrs. Dye's car to Beanie and that Kyles had retrieved his own car from the Schwegmann Bros.'s parking lot after the murder, but also by planting various pieces of incriminating evidence at Pinkie Burnes' apartment; and, finally, that Wallace himself possibly had some role in the Dye murder.

As an initial matter, unlike the majority I assume here that, had Wallace been interviewed by Kyles' trial counsel, counsel would have called Wallace as a defense witness at trial and attempted to have Wallace explain his various statements given to the State before trial. This scenario assumes that Wallace would have agreed to testify and would not have invoked his Fifth Amendment right to avoid self-incrimination. The State has never suggested that Wallace would have done so, perhaps because there is a serious question about whether Wallace could have effectively made a "blanket" invocation of the Fifth. See State v. Smith, 573 So.2d 1233, 1236 (La. App. 1991); State v. Boyd, 548 So.2d 1265, 1268-69 (La. App. 1989).[63] Assuming that Wallace had invoked the Fifth in

_____

[63] Although obviously Wallace could have invoked the Fifth regarding certain questions (e.g., how Wallace knew the location of the murder in the Schwegmann Bros.'s parking lot), other lines of defense questioning would have been proper and not potentially incriminating (e.g., asking Wallace to explain the various inconsistencies in his statements). I also observe that the trial judge would have had discretion to permit the defense to

66

whole or in part, Wallace's invocation would have presented Kyles with valuable ammunition supporting the theory of the defense. Why, Kyles' trial counsel could have argued to the jury, did the State's informant invoke the Fifth in a case in which he was supposedly only a "good citizen"?

Furthermore, assuming that Wallace had invoked the Fifth in whole or in part, Kyles' trial counsel would nevertheless have been able to utilize the various Brady evidence regarding Wallace.[64] Much, if not all, of Wallace's various inconsistent statements would have likely been admissible in other ways. For instance, by calling the various New Orleans police who worked with Wallace (or possibly even prosecutor Cliff Strider) as hostile defense witnesses and questioning them about their meetings with Wallace and about the information available to them during the investigation -- rather than whether such information was in fact true -- a great deal of Wallace's statements could have been introduced as non-hearsay under Louisiana evidence law in operation at the time of Kyles' trial. Finally, simply by proffering Wallace's various inconsistencies -- rather than arguing that any of them were in fact true -- the defense could have offered the statements as non-hearsay under Louisiana evidence law. See State v. Hennigan, 404 So.2d 222, 228-29 (La. 1981) ("[E]vidence is not

_____

ask Wallace potentially incriminating questions in front of the jury. See State v. Edwards, 419 So.2d 881 (La. 1982).

[64] The remainder of the Brady evidence -- such as the police memoranda -- would have been admissible and highly relevant standing own its own, irrespective of whether Wallace had been called as a witness.

hearsay when offered to prove only that it occurred . . . or that a conversation took place.").[65]

I also observe that all of the Brady evidence would have directly supported the actual evidence and testimony presented by the defense at Kyles' trial -- a theory of the defense that provoked a hung jury on its own without the Brady evidence. As I discuss below, information gleaned from Wallace's various statements -- such as his admissions that he indeed possessed Mrs. Dye's car shortly after the murder, that he changed its license plates, and that he was actually present at the "Sunday dinner" at Pinkie Burnes' apartment on the Sunday after the murder -- would have bolstered the credibility of key defense witnesses.

**a) The deadlocked jury at Kyles' first trial**

The majority, echoing the district court, states that Kyles "faces overwhelming evidence of guilt," a conclusion which dictates the majority and district court's rejection of Kyles' ineffectiveness and Brady claims. That is, the majority reasons that Kyles could not have been prejudiced because the result of the proceeding would have been the same whether or not the constitutional errors occurred. If indeed that were true, then why did Kyles' first jury trial, which occurred immediately before the

_____

[65] A competent trial counsel could have laid the proper evidentiary foundation for introducing Wallace's various statements by first questioning police officers such as Detective Dillman about the New Orleans Police Department's basis for suspecting that Kyles was the murderer and why the police believed that incriminating evidence would be inside Pinkie Burnes' apartment and in her garbage.

second trial and which involved essentially the same evidence and prosecution and defense theories, end in a mistrial because of a deadlock on the question of guilt?  The theory of the defense -- even without all of the critical evidence withheld and without Wallace's testimony -- was obviously not as weak as has been claimed.  See Stano v. Dugger, 901 F.2d 898, 903 (11th Cir. 1990) (en banc) (in finding a Brady violation, the court pointed out that a deadlocked jury had caused mistrial at defendant's prior trial).

As the Supreme Court has repeatedly observed, appellate judges are presented with only a "cold record" from which to evaluate the proceedings that transpired below.  See, e.g., Patton v. Yount, 467 U.S. 1025, 1039-40 (1984).  In most cases, we cannot accurately assess the credibility of witnesses and the plausibility of counsel's arguments based on the evidence merely from reading the statement of the facts.  We are not aware of such important subtleties as a witnesses' demeanor or trial counsel's apparent sincerity (or lack thereof).  In this regard, the fact that one or more jurors at Kyles' first trial were not convinced beyond a reasonable doubt of his guilt is significant in assessing the force of Kyles' case or, alternatively, the weaknesses in the State's case.

**b) "Beanie" Wallace's various undisclosed statements**

Of all of the Brady evidence, I consider Beanie Wallace's undisclosed statements to be the most significant.  First, the

statements reveal that the State's informant, who was crucial to the State's ability to finger Kyles in the first place, was an incessant liar and schemer who appeared anxious to see Curtis Lee Kyles arrested for the murder of Delores Dye. Second, the statements contain significant exculpatory evidence. I first note the significant contradictions in his various statements.

## 1) Contradictions

Wallace's September 22, 1984 (Saturday) oral statement[66] to New Orleans police consisted of the following chronology: on the prior Friday, at approximately 6:00 p.m., Kyles sold Mrs. Dye's red Ford to Wallace; at 9:00 p.m., Wallace, Kyles' brother-in-law, and Kyles drove to Schwegmann Bros.'s parking lot to retrieve Kyles' car; while at the supermarket, Kyles also retrieved a large brown woman's purse from nearby bushes. Wallace's September 23, 1984 (Sunday) written statement to police consisted of the following chronology: on the prior Friday, at approximately 6:00 p.m., Kyles sold the red Ford to Wallace at some location on Mazant Street in New Orleans; after the purchase, Wallace, Kyles, and Kyles' brother-in-law unloaded bags of Schwegmann Bros.'s groceries and a brown purse from the red Ford's trunk and back seat and placed them in Kyles' car; the three then drove to Pinkie Burnes' apartment, where the groceries were unloaded; at approximately 9:00 p.m., Wallace, Kyles, and Kyles' brother-in-law drove to Schwegmann Bros.

---

[66] It is noteworthy that in making this first statement Wallace assumed the alias "Joseph Banks" and was not forthcoming about his criminal record, namely a conviction of being an accessory to a murder, and instead claimed that he had been convicted only for "fighting."

to retrieve Kyles' car; at Schwegmann Bros., Kyles also retrieved a "big brown pocketbook he had by the building."

In Wallace's final oral statement, memorialized in the handwritten notes of the chief trial prosecutor, Cliff Strider, Wallace recounted the following chronology: on Thursday, September 20, 1984, in the early evening, sometime after 5:00 p.m., Wallace, Kyles, Kyles' brother-in-law, and Kevin Black drove from Pinkie Burnes' apartment in the brother-in-law's car to Schwegmann Bros., where they retrieved Kyles' car; the four thereafter returned to Pinkie Burnes' apartment; at approximately 7:30-7:45 p.m., the four then drove to Black's residence, where they retrieved bags of Schwegmann Bros.'s groceries and a brown purse; the four then returned to Pinkie Burnes' apartment, where the Schwegmann Bros.'s bagged groceries and the brown purse were taken into the apartment; the next day, Friday, in the early afternoon, Kyles drove Wallace to Black's house where Wallace purchased Mrs. Dye's stolen red Ford; Wallace drove the red Ford around New Orleans with a friend, Ronald Gorman,[67] until early Saturday morning; on Saturday afternoon, Wallace changed the license plates on the car and then

---

[67] Gorman was a defense witness at trial, who testified that Wallace, wearing his hair in braids, possessed the red Ford on the day of the murder and attempted to sell it to Gorman.
I further note that included in the habeas record is an undisclosed transcript of a conversation between New Orleans Police Detective Pascal Saladino, who worked on the Dye case, and Gorman. The transcript is dated November 28, 1984, which was in the interim between Kyles' first and second trial. Towards the end of the statement, Gorman told Saladino that Beanie Wallace had threatened to kill Gorman if he testified on behalf of Kyles (and, thus, against Wallace) at the second trial. The transcript was first introduced into the record at the state habeas evidentiary hearing.

discovered that the car had been stolen from Mrs. Dye; thereafter, Wallace contacted police on Saturday night.

Unlike the majority, I believe that it is obvious that these three statements contain significant inconsistencies that would have been extremely valuable to the defense. In particular, the various inconsistencies would have permitted jurors to see that Wallace was an opportunist and liar. The changes in the dates and times of when he was sold the car, when the groceries were retrieved, and when Kyles' car was allegedly retrieved from the Schwegmann Bros.' parking lot -- statements given within a day or two after the alleged events -- would have painted a compelling picture of someone who was lying to police or at least one who knew much more than he was telling the police. A jury could reasonably conclude that Wallace was spinning an elaborate web of lies, thus discrediting a significant portion of the prosecution's theory of the case.[68]

The majority greatly discounts the significance of evidence of Wallace's scheming to have Kyles arrested for Mrs. Dye's murder. The majority argues that because the theory of the defense at trial

---

[68] Especially noteworthy is Wallace's claim in his September 23, 1984 statement to police that, at approximately 6:00 p.m. on Friday, September 21, Kyles, Kyles' brother-in-law, and Wallace moved the groceries from the stolen red Ford to *Kyles' own car*. Then, Wallace claimed, three hours later, Kyles requested that Wallace and Kyles' brother-in-law drive Kyles to Schwegmann Bros. in order to retrieve *Kyles' own car.* This asks one to believe that on the day after the murder Kyles returned to the murder scene and left his car that had not been parked there previously. Furthermore, these claims take on particular relevance in view of the State's attempt to prove at trial -- using a blurry, blown-up police photograph -- that Kyles' car was parked at the murder scene on Thursday afternoon immediately following the murder.

72

was that Beanie framed Kyles, the "new" evidence would have only been "cumulative." See Majority Opinion, slip op., pp.20-24, ___F.2d at ___-___. The majority's reasoning here assumes that the jury would have had no more reason to believe the defense's theory if the various undisclosed evidence had been introduced. As the majority correctly observes, the first line of defense at both of Kyles' trials was that Beanie Wallace framed Kyles and possibly that Wallace was in fact somehow involved in the murder. That defense was supported by relatively weak evidence at trial -- testimony of Kyles' friends and family. The undisclosed evidence, in particular Wallace's own words, would have greatly bolstered the theory of the defense. The Brady evidence in this case would have afforded the defense the opportunity to argue forcefully that Wallace framed Kyles and that perhaps Wallace himself had some role in the murder.[69]

## 2) Potentially exculpatory material

Wallace's statements are also significant in that they contain direct or indirect exculpatory material. There are numerous statements made in the September 21, 1984 (Saturday) tape-recorded

---

[69] I note that at trial there was no direct evidence of just how Kyles became the New Orleans Police Department's leading suspect in the Dye murder. The State never called Wallace as a witness and no policemen were called to testify about Wallace's involvement in the investigation. Rather, it was apparently assumed in the respective theories of the prosecution and defense during the trial that Wallace had some role in the murder investigation. Thus, the jury likely was not aware of the significance of Wallace's role and could only infer that Wallace must have had some role in the police effort based on the defense claims that Wallace was in possession of Mrs. Dye's car.

conversation that are notable in this regard.  First, Wallace twice made a significant admission: he changed the license plates on the stolen red Ford.  As Kyles argues, this action casts into doubt the State's claim that Wallace was simply an unwitting *bona fide* purchaser of a stolen automobile.[70]  It also would have corroborated trial testimony of Johnny Burnes, Wallace's self-styled "partner," who testified (under attack from the prosecution) that he witnessed Wallace changing the plates on a red car on the day of the murder.[71]

---

[70] I observe that at trial Detective John Dillman, who headed the New Orleans Police Department's investigation into Mrs. Dyes' murder, was squarely asked by Kyles' trial counsel, "[a]re you aware that Beanie changed the license plate on this red vehicle belonging to Mrs. Dye?"  Detective Dillman responded under oath that, "I have no knowledge of that, sir."

[71] At trial, Johnny Burnes obviously attempted to boost his credibility by stating that he and Wallace were "best friends" at the time of Kyles' arrest; this claim would have been supported by Wallace's repeated references to Burnes as his "partner."
     The majority states that the state trial court found that Johnny Burnes was not a credible witness.  The majority holds that this finding is entitled to deference under 28 U.S.C. § 2254(d).  See Majority Opinion, slip op., at p.24, ___ F.2d at ___.  The majority errs here, at least if it is holding that we are bound by a state court fact-finding that Johnny Burnes was not credible as-a-matter-of-law at trial, which the majority appears to hold.  The state trial court found that Burnes was not credible *at a post-conviction hearing* where Burnes testified, not in Burnes' testimony at trial. I further note that the majority's apparent reliance on § 2254(d) regarding Burnes' credibility *at trial* is inappropriate here because Johnny Burnes' credibility at trial could have been significantly boosted by this evidence that the State failed to disclose.  The finding by the state trial court thus cannot bind us regarding Burnes' *trial* testimony. Even if the majority's characterization of the state court's finding was correct -- which it is not -- a state habeas court's view of the weight of evidence or testimony actually offered at a jury trial could be "found" by a state trial judge to be, in effect, incredible as-a-matter-of-law.  Such a credibility finding -- a *factual* finding -- wrongly enters into the province of the jury; that is, the credibility of a witness' trial testimony would be a quintessential question for a jury, not a trial judge.

74

Burnes also provided other testimony important to the theory of the defense, namely that on Sunday, September 23, 1984, Burnes witnessed Wallace stooping down at the stove in Pinkie Burnes' apartment where police ultimately recovered the murder weapon.

Second, Wallace's "tips" to police that they "would be smart" to look in the garbage outside Pinkie Burnes' residence and that they could "set up" Kyles and find the murder weapon inside the apartment suggest that Wallace was in control of critical evidence. A jury could rationally infer based on Wallace's apparent control over the evidence that he was somehow involved in the murder.[72] Also significant in this regard are Wallace's various confusing claims about how Mrs. Dye's purse was retrieved at the scene of the murder. In particular, Wallace made the odd claim that Kyles retrieved Mrs. Dye's purse from bushes next to the Schwegmann Bros.' parking lot. This simply makes no sense. Eyewitnesses to the murder testified that Mrs. Dye's brown purse was placed in the trunk before she was confronted by her attacker. No one testified that the assailant took her purse and placed it in nearby bushes

---

[72] In claiming that the undisclosed tape recording and various internal police memoranda regarding the garbage were not "material" under Bagley, the majority argues that even without the undisclosed evidence regarding the garbage tip, "Kyles made a credible case that Beanie could have planted this evidence. It was undisputed at trial that *anyone* could have had access to the garbage bags sitting on the curb and that Beanie was attempting to incriminate Kyles." Majority Opinion, slip op. at p.23, ___ F.2d at ___. The majority makes the erroneous assumption that Wallace's mere opportunity to plant the incriminating items and concrete evidence that Wallace actually suggested to police that they should look into the garbage would have been equivalent in jurors' eyes. I simply cannot believe that a jury would not have given tremendous weight to Wallace's tip to police as highly probative evidence that he framed Kyles.

before driving her car away. Even assuming that the purse did not somehow make its way into Mrs. Dye's car, which her assailant immediately drove away, this hardly explains how the purse could have ended up in nearby bushes. Wallace's bizarre claims about retrieving the purse from the bushes suggest that he was lying in order to dispel suspicion from himself about having possession of the purse. A jury could reasonably infer that Wallace's unsolicited communication to the police, when combined with his statements about such key evidence, indicated that he indeed "framed" Curtis Lee Kyles.[73]

Wallace made another incriminating admission during the first recorded conversation: he evinced an apparent awareness of the specific part of the parking lot where Mrs. Dye was killed. Although a jury possibly could rationally conclude, as the State and the majority contend, that Wallace gleaned this particular information from the media, a jury also certainly could reasonably conclude otherwise. This is potentially critical information to

---

[73] I note that Detective Dillman explicitly testified at the state habeas evidentiary hearing that he was *not* given the tip that evidence might be found in the garbage outside Pinky Burnes' apartment from Wallace. Similarly, one of Sergeant Eaton's underlings, Officer Pascal Saladino, who actually seized the garbage, testified at trial that the police did not act on a tip in seizing the garbage. The State argues in its appellate brief that "[i]t is not clear that Beanie made this suggestion, but assuming he did, so what? In the context of the facts of this case, it is a suggestion that would not be unexpected and a conclusion that the police would be expected to reach." I observe that, at the state court post-conviction evidentiary hearing, Kyles' chief trial prosecutor testified that he did not remember a single instance before Mrs. Dye's murder where New Orleans police had searched and seized garbage on the street in front of a residence.

the theory of the defense in view of the fact that Wallace consistently denied that Kyles, Kyles' brother-in-law, or any of Kyles' other compatriots told Wallace that Kyles had murdered Mrs. Dye.

Another bit of potentially valuable information that Wallace disclosed in the September 22 statement that bolsters the theory of the defense concerns his repeated statements that Kyles not only generally wore a "bush" hairstyle, but also wore one on the day that Wallace purchased the car. Although Wallace at one point claimed that he bought the car on *Friday*, in at least one statement he also claimed that he was in the presence of Kyles on *Thursday*, within three hours of the murder. When combined with the numerous eyewitness statements describing the murderer as wearing his hair in braids or plaited, a rational jury could find this statement significant.

Finally, Wallace's admission to Assistant DA Cliff Strider that Wallace was in fact present during the "Sunday dinner" at Pinkie Burnes' apartment is evidence from which a jury could infer that Wallace had an opportunity to plant the various incriminating items. Furthermore, in this regard, Wallace's statement specifically comports with Johnny Burnes' trial testimony that he witnessed Wallace reaching down and placing something behind the stove that Sunday night.

**c) The undisclosed eyewitness statements**

77

As the district court correctly observed "the essence of the [S]tate's case . . . was founded on the positive identification by four eye-witnesses who saw Curtis Lee Kyles at varying stages of the incident calmly placing a gun to the head of an unarmed woman, and blowing her brains out (for absolutely no other reason than to rob her), and then driving away in her car." Despite specific requests from the defense during pre-trial discovery, the State did not disclose the contemporaneous witness statements taken by New Orleans police from three of those four witnesses who testified at trial.[74]

---

[74] Those four witnesses were Robert Territo, Isaac Smallwood, Henry Williams, and Darlene Cahill. Contemporaneous statements were only taken from Territo, Smallwood, and Williams. Three other eyewitnesses -- Lionel Plick, Edward Williams, and Willie Jones, none of whom ever positively identified Kyles -- did not testify at trial. According to the testimony of Officer John Dillman, three of the eyewitnesses, Smallwood, Henry Williams, and Territo, were able to positively identify Kyles from a pre-trial photographic line-up conducted a few days after the murder. That line-up consisted of pictures -- both a frontal view and profile -- of six young black males from the waist up. Kyles was #6 in the spread. Wallace was not a part of the spread. I observe that, in pictures with equivalent hair styles, Wallace and Kyles' facial features resemble each other. See also Kyles v. State, 513 So.2d at 268 ("There was . . . testimony that Wallace and [Kyles] resembled each other."). Indeed, as Kyles points out, one of the eyewitnesses who identified Kyles out of the pre-trial photo-line up, Isaac Smallwood, positively identified Wallace rather than Kyles when presented with a post-trial photo line-up in which Kyles and Wallace had identical hair styles.

I also observe that the police officer who conducted the photo line-up and who testified about it at trial, John Dillman, made numerous statements under oath in the state court proceedings that cast serious doubt on his credibility. See supra. Such statements included testimony about the contemporaneous witness statements given by the eyewitnesses who testified at trial. As discussed supra, those witness statements were not turned over to the defense at trial, despite a specific request, because the State claimed that they contained nothing exculpatory. Dillman nonetheless testified about them at trial,

Kyles points to Isaac Smallwood's statement, in which Smallwood described what he saw as follows: "I was standing near the old gas pumps, with my back facing the Chef Hwy. and facing old Gentilly Rd. *I heard a loud pop. When I looked around I saw a lady laying on the ground, and there was a red car coming toward me.*" (emphasis added). According to this statement, Smallwood's identification of the assailant came when he drove the car, which Smallwood described as a "red thunder bird," past him. When a police investigator specifically asked him, "[w]hen you first heard the shot, and looked at the lady on the ground, was the black male standing near her?," Smallwood responded "*[n]o. He was already in the car and coming toward me.*" (emphasis added).

---

without producing copies of them.

Kyles' trial counsel, on cross-examination of Dillman, asked him "[d]id these physical descriptions differ in any single point?" Dillman responded that "[p]ossibly the only discrepancy would have been in height. . . . *The discrepancy would have been anywhere from a description of five feet eight to a description of possibly six feet tall, which is a difference of three or four inches.*" (emphasis added). This response, of course, was simply untrue. Henry Williams' witness statement estimated that the killer was as short as 5'4", which would make the discrepancy *eight* inches. Similarly, when asked about age discrepancies, Dillman stated that the eyewitnesses all described the killer as being in his twenties when in fact three different eyewitness described the killer as ranging from seventeen to nineteen years old. As noted, Kyles was twenty-five at the time of the crime, and the photographs of Kyles in the record depict a man in his mid-twenties. Dillman also claimed that there was "no discrepancy in facial hair or features at all," when in fact Isaac Smallwood described the killer as having a moustache, a feature described by none of the other eyewitnesses, many of whom claimed to have seen the killer up-close. (In photos of Kyles both before and after the killing, he possesses a light moustache.) Finally, Dillman neglected to mention that Smallwood described the killer as having shoulder-length braided hair, while Henry Williams described the killer as having "short" hair.

Both at the pretrial suppression hearing and at trial, however, Smallwood gave a significantly different eyewitness account. He testified that he actually saw the black assailant, whom he positively identified as Kyles, struggling with Mrs. Dye. He further testified that he specifically saw Kyles raise the pistol -- which Smallwood described as a "small black . . .32" -- and shoot Mrs. Dye in the head.[75] Smallwood also described Mrs. Dye's car as a red "LTD." Thus, by the time of trial, Smallwood had not only changed his story by claiming that he actually witnessed the struggle and shooting, but also described it in vivid detail. He described the murder weapon as a small black .32 caliber pistol -- which, of course, was the type of murder weapon used -- and changed his description of the victim's car from a "thunderbird" to a "LTD."[76] Jurors were also not told that, shortly after the crime, Smallwood described the assailant has having shoulder-length hair and a moustache -- descriptions given by none of the other eyewitnesses.

---

[75] When asked to describe what he witnessed, Smallwood informed jurors that "[w]ell, me and my partner was standing by the gas pump in Schweggman's parking lot. My partner seen this guy wrestling with this lady. We thought they was just playing with one another, thought they knew one another. So the guy, he snatched her hand. When he snatched her hand, she wouldn't release the keys from her hand, so he just went up in his pocket and shot her in the head . . . [with] like a small .32, a small black gun that he took out of his right pocket." *When specifically asked by prosecutor Strider, "[a]nd did you see him actually shoot her?," Smallwood stated "Yeah."*

[76] Smallwood's correction of such minutiae between the time of making the contemporaneous witness statement and the time of trial raises serious questions in my mind. In particular, the embellishment suggests that Smallwood was coached.

A second of the four eyewitnesses who testified at trial, Henry Williams, told police shortly after the murder that the assailant was "a black male, about 19 or 20 years old, about 5'4" or 5'5", 140 to 150 lbs., medium build, dark complexion, his hair looked like it was platted, it was short."  I observe that the record makes numerous references to Curtis Kyles as being approximately six feet tall and slender; photographs in the record confirm these descriptions.  Conversely, Joseph "Beanie" Wallace was described as being shorter than Kyles, perhaps as much as by a half a foot.  Photographs of Wallace also depict a man possessing a medium build.

Both of these witness statements, neither of which were disclosed despite a specific pre-trial request by the defense, would have been valuable to the defense at trial.  A reasonable juror could not have reached any other conclusion except that Smallwood dramatically changed his story by the time of trial, thereby undermining the credibility of his identification.[77]  Williams, too, would have had a difficult time explaining how he could have described a 6' skinny man as being 5'4" or 5'5" and possessing a "medium" build.

------

[77] The majority concludes that because "Smallwood consistently stated that the gunman . . . drove [Mrs. Dye's car] close by him [Smallwood]," Smallwood's identification of Kyles at trial was reliable.  See Majority Opinion, slip op., at p. 16. The majority here ignores the important fact that a jury would probably have disbelieved *anything* that Smallwood said after it was revealed that he had fundamentally changed his account of the murder by the time of trial.

The district court and the majority make much ado about the fact that all four eyewitnesses who testified at the second trial positively identified Kyles as the killer after the State brought in Wallace and had him and Kyles stand side by side for comparison. I do not believe that fact to be nearly as significant as the majority does. First, the same witnesses had, on numerous occasions,[78] previously identified Kyles in court as the killer, in identifications in which Kyles sat at the defense table and was not compared to Wallace. Three of the four had also seen Kyles -- but not Wallace -- in photo spreads. Human nature as it is, the four had a psychological incentive, subconscious or otherwise, not to recant their positive identifications of Kyles.

Second, I believe that the in-court identifications by Williams and particularly Smallwood are of little probative value. While it is true that in-court identifications are generally considered significant prosecutorial evidence, see generally Manson v. Brathwaite, 432 U.S. 98 (1977), such evidence loses a great deal of its probative force when the defense establishes that a witness gave a significantly different account at the time of the original identification, cf. Neil v. Biggers, 409 U.S. 188, 199 (1972) (noting that a key factor in deciding whether impermissibly suggestive line-up procedure followed by in-court identification caused harm to defendant is "the accuracy of the witness' prior

_____

[78] At both trials, the witnesses identified Kyles both in pre-trial suppression hearings and during the prosecution's case-in-chief. The comparative identifications, in which Wallace was made to stand besides Kyles, occurred at the second trial during the prosecution's rebuttal.

82

description of the criminal"). Moreover, as the Supreme Court has observed, the effective impeachment of one eyewitness may have consequences that extend to another, unshaken eyewitness. See United States v. Agurs, 427 U.S. 97,

112-13 n.21 (1976) (citing Comment, *Brady v. Maryland and The Prosecutor's Duty to Disclose*, 40 U. CHI. L. REV. 112, 125 (1972)). In Kyles' case, the remaining unimpeached eyewitness testimony would thus have been considerably less forceful had the two witness statements been disclosed.

Finally, it should also be generally noted that eyewitness testimony, contrary to popular belief, has repeatedly been proven notoriously unreliable. See United States v. Wade, 388 U.S. 218, 228 (1967); Loftus & Ketcham, *Witness for the Defense: The Accused, the Eyewitness, and the Expert Who Puts Memory on Trial* (1991); Sanders, *Helping the Jury Evaluate Eyewitness Testimony: The Need for Additional Safeguards*, 12 AMER. J. CRIM. L. 189 (1984). As the United States Supreme Court observed in Wade, "[t]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." 388 U.S. at 228.[79]

---

[79] In a Rule 60(b) motion filed in the district court following the denial of the habeas writ, Kyles for the first time offered an affidavit from one of the eyewitnesses who testified at trial -- Darlene Cahill (now Darlene Kersh) -- in which she swears under oath that she perjured herself at Kyles' two trials. The affidavit claims that she never in fact saw the murderer's face and that her trial testimony, in which she unequivocally identified Kyles as the killer, was entirely false. She further claims that she informed the prosecution of her inability to identify Kyles, but that prosecutors asked her to commit perjury. The district court held that the claim based on Cahill's

**d) The remaining <u>Brady</u> evidence**

**1) The computer print-out of license plate numbers**

Another item of <u>Brady</u> evidence that was wrongly withheld, according to Kyles, was a New Orleans Police Department computer print-out and attached cover memorandum dated "9-20-84" from

---

testimony was an abuse of the writ. The court further held that, even if it were not abused, "such evidence would not have affected the jury verdict in this case. [Kersh's] testimony was cumulative and in the context of the entire trial transcript, rather inconsequential. . . . Ms. Kersh's testimony was of little consequence in relation to the other eye-witnesses and the evidence found in Kyles' girlfriend's apartment."

In a prior appeal in this case, this court held that Kyles' claim was not appropriately raised for the first time in a Rule 60(b) motion and that further the claim had never been exhausted in the state courts. <u>See</u> <u>Kyles v. Whitley</u>, Nos. 92-3310, 92-3542 (5th Cir. August 7, 1992). We held that "a habeas petitioner may not use Rule 60(b) to raise constitutional claims that were not included in his original habeas petition." We further held that "[t]he district court should not, however, have said anymore" in its order denying relief.

I believe that this claim should be returned to state court so that all of Kyles' specific claims may be reevaluated in view of this extremely serious allegation of prosecutorial misconduct and perjury -- which, if proven true, would further demonstrate the pervasiveness of official misconduct in this case. I note that Kyles' this new claim should not be held to be an abuse of the writ, assuming that this case makes its way back to federal court. As a general rule, I would of course agree that any constitutional claims raised for the first time after the district court denies an original habeas petition are abused. <u>See</u> <u>McClesky v. Zant</u>, 111 S. Ct. 1454 (1991). However, because Kyles' new claim adds further fuel to the fire in terms of my concerns about whether Kyles was wrongly convicted, I would hold that the claim is not abused under the exception that permits claims to be raised for the first time in a successive habeas petition if a petitioner makes a "colorable showing of factual innocence." <u>See</u> <u>id.</u> at 1471.

I further observe that the "materiality" standard regarding intentionally perjured testimony is "considerably less onerous" than the <u>Brady</u> "materiality" standard set forth in <u>United States v. Bagley</u>. <u>See</u> <u>Kirkpatrick v. Whitley</u>, 992 F.2d 491, 497 (5th Cir. 1993). In cases where the prosecution intentionally procured or countenanced perjured testimony, a court must order a new trial if there was "any reasonable likelihood that the false testimony could have affected the jury's verdict." <u>Id.</u>

Detective Patrick Jones to Detective John Dillman. The memo states, "[a]ttached you will find a print out of vehicles which were parked in the parking lots around Schweggmans [sic] on 9-20-84 at 9:15 p.m." Kyles argues that this print out, which was not disclosed to defense counsel at trial, would have been valuable exculpatory evidence because it tends to prove that Kyles' car was not in the parking lot on the night of the murder.

At trial, the State introduced a photograph made by police at the crime scene immediately following the murder. The blurry, blown-up photograph, according to the State, depicts a portion of the top of Curtis Kyles' car, which allegedly was still parked in the Schwegmann Bros.'s parking lot within an hour or two after the murder. As I discuss infra, the State's photographic evidence here is anything but conclusive. Had Beanie Wallace taken the stand at trial and repeated his claim made twice to police that he, Kyles, and Kyles' brother-in-law drove to Schwegmann Bros.'s parking lot on the evening of Friday, September 21, 1984, to retrieve Kyles' car, the computer print-out would have been valuable impeachment material, thus supporting the theory of the defense.[80]

The district court stated that the print-out "fails to fit the Brady mold" because at the state post-conviction evidentiary hearing "the defense learned that the list was not a complete list of the cars in the lot at the time; therefore, it is evidence that

---

[80] Even if Beanie Wallace had claimed that the car was retrieved on Thursday early in the evening -- before the license numbers were recorded by police -- Wallace's two inconsistent statements given to police would have been available to impeach Wallace's credibility on this point.

would carry little if any exculpatory weight . . . ." The testimony to which the district court referred was given by Detective John Miller, who testified that the print-out was incomplete and likely did not include the parking lot that was supposedly depicted in the blown-up police photograph offered into evidence at trial.

I believe that the district court erred by accepting Miller's testimony as conclusive. Assuming the print-out was available to the defense at the time of trial, defense counsel would have been free to argue that the list was a complete one. Indeed, I observe that the list contains seventeen different license numbers, and the memorandum attached to it states "attached you will find a print out of vehicles which were parked in *the parking lots around Schweggmans [sic] on 9-20-84 at 9:15 p.m.*" (emphasis added). The memorandum does not state that it is a "partial" list or that it was a list of vehicles in a portion of the Schwegmann Bros.'s parking lot. This memorandum, by not qualifying the scope of the police's search of automobiles in the Schwegmann Bros.'s parking lots in any manner, belies Detective Miller's claim. Finally, Miller's name does not appear among the five police officers' names listed on the memorandum. The issue of whether the list was or was not complete would have been a quintessential jury question.

**2) The police garbage memorandum**

As discussed, supra, with respect to Beanie Wallace's September 21, 1984 suggestion to police regarding the garbage, the

State also failed to disclose police memoranda relating to the search and seizure of the garbage in front of Pinkie Burnes' apartment on September 24, 1984. In particular, Kyles points to a memorandum dated "9-23-84" from Sergeant James Eaton to Sergeant Dave Morales that states "[w]e have reason to believe" Mrs. Dye's personal effects and Schwegmann's bags would be in the garbage scheduled to be picked up by sanitation workers on Monday morning. Like Wallace's recorded statement to police in which he makes the garbage tip, I believe that this would have been valuable evidence that would have bolstered the theory of the defense that Wallace "framed" Curtis Lee Kyles.

**e) The remainder of the State's case**

Once the effect of all of the <u>Brady</u> evidence is considered, what is left of the State's case is tenuous at best. The majority points to the fact that the murder weapon, a homemade holster, bullets, and pet food supposedly purchased by Mrs. Dye at Schwegmann Bros. were found in Pinkie Burnes' apartment as strong circumstantial evidence of Kyles' guilt. I disagree. Kyles took the stand and claimed that the weapon and holster did not belong to him and must have been planted. While ordinarily such a self-serving claim indeed would have little weight, the majority ignores the strong circumstantial evidence that Beanie Wallace in fact planted evidence -- namely, his tips to police that they "would be smart" to look in the garbage and they could "set up" Kyles and find the murder weapon. The majority also ignores the evidence

87

that Wallace had a ready opportunity to plant the evidence during the "Sunday dinner" at Pinkie Burnes' residence.

With respect to the pet food found in Pinkie Burnes' apartment, Kyles testified that he had purchased the cans at the Schwegmann Bros. -- which was located "very near" Pinkie Burnes' apartment, according to trial testimony -- during the previous week or so. While Kyles claimed that he remembered the items being "on sale," the State introduced evidence that the particular brands of pet food were not sale-priced but instead were regularly priced. The majority contends that this testimony undermines Kyles' explanation for the presence of the pet food. However, a closer reading of Kyles' testimony undercuts this supposedly damning bit of impeachment evidence about what was actually a collateral matter.[81] Furthermore, I read Kyles testimony to actually bolster

---

[81] The alleged existence of a sale price was gratuitously offered by Kyles during his testimony. It was not as if the pet food allegedly purchased by Kyles and that supposedly purchased by Mrs. Dye were distinguishable by the fact that one was on sale and the other was not. Indeed, the State's own evidence established the contrary. Furthermore, I believe that the State and the majority put entirely too much stock in the import of Kyles' testimony. The following colloquy occurred between the prosecutor and Kyles:

Q. [prosecutor:] How do you know it was on sale?

A. [Kyles:] Because they had a little sign that said three for such and such, two for such and such at a cheaper price. It wasn't even over a dollar.

Q. There was a sign where?

A. In the Schwegmann's Supermarket. . . . It wasn't big. It was a little bitty piece of slip like they had on the shelf. As I was looking at the cat food, I was looking at these many for so much. [sic].

88

his credibility in one significant respect. *Before being shown the cans by the prosecutor -- cans that were seized and in the possession of the State at trial --* Kyles stated that the pet food cans were priced "two" or "three for such and such . . . . It wasn't even over a dollar." During cross-examination, the cans were *first introduced by the prosecutor* after Kyles had testified about them being "on sale." The prices were revealed as in fact being "two for 77 cents" and "three for 89 cents." The actual prices of the cans fully and precisely comport with Kyles' description. I simply do not believe that this is mere coincidence. Also with respect to Kyles' claim that he purchased the pet food for his children's own pets, the state habeas courts and the federal district court ignored the important fact that one of the State's own photographs offered into evidence at trial depicts the inside of a closet in the apartment in which a half-empty bottle of pet shampoo is clearly visible.

The State also has argued that the Schwegmann's sales receipt bearing Kyles' fingerprints that was found in Mrs. Dye's car is

---

Q. They had two different signs [for the two brands purchased]?

A. They have a sign by every item in there.

Kyles, whose intelligence is limited, <u>see</u> <u>Kyles v. State</u>, 513 So.2d at 274 (noting Kyles' IQ is 83), appears to me to have been inartfully explaining that he believed that the cans of pet food were "on sale" simply because they were marked two or three for a particular price. His reference to a sale "sign" actually appears to be referring to stock labels that are commonly used in grocery stores and regularly appear on the shelf (as he stated, "a little bitty piece of slip like they had on the shelf . . . . They have a sign by every item in there.").

89

strong circumstantial evidence against Kyles. Kyles testified that he indeed did ride in the car, which Wallace at that point possessed, on the Friday, September 21, 1984 -- one day after the murder. Kyles stated that Wallace came by Pinkie Burnes' residence and the two drove to Schwegmann Bros., where Kyles purchased a can of transmission fluid and a package of cigarettes.[82] At trial, Kyles theorized that the receipt must have fallen out of the bag into the car when he removed the items. As noted in supra Part I., *the receipt was the only physical evidence offered by the State that bore Kyles' fingerprints. Not the murder weapon. Not the purse or any other of Mrs. Dye's belongings. And not Mrs. Dye's car.*

Under scrutiny, the sales receipt, like the rest of the State's evidence, not only fails to incriminate Kyles but actually supports the theory of the defense. To begin with, the receipt was only approximately two inches long. Yet Mr. Dye testified that he believed that his wife was shopping for *an entire week's groceries* not only for Mr. and Mrs. Dye, but also for houseguests. Mr. Dye testified that his wife usually brought home six or eight bags of groceries whenever she went shopping at Schwegmann Bros.[83] The

---

[82] As discussed in supra Part I., Wallace's various statements indicate he was in fact in possession of the car, as Kyles claimed, at least by Friday. To corroborate his claim that he bought transmission fluid for his car, Kyles also offered into evidence a color photograph of his car apparently leaking some type of oily fluid.

[83] Perhaps the only consistent point in all of Wallace's statements to police was that there were numerous bags of Schwegmann Bros.'s groceries in Mrs. Dye's car.

State never explained the obvious variance between the length of the receipt with Kyles' fingerprints on it and the length of the receipt that would have resulted from a week's grocery-shopping.

Also notable is the fact that a State's witness who testified about the receipt stated that the receipt was recovered from "the right front floorboard," i.e., the passenger's compartment. Kyles testified that Wallace drove him to Schwegmann Bros. and, thus, his claim is consistent not only with the length of the receipt but also the placement of it in the passenger's compartment. Because the police destroyed writing on the receipt in removing Kyles' fingerprints from it, there is no way to know with certainty whether the receipt in fact memorialized a purchase on the day of the murder or on the next day, as Kyles claimed. However, the circumstantial evidence supports Kyles' version of events.

The last significant piece of evidence offered by the State at trial was a blurry, blown-up photograph of what the State claimed is Kyles' rust-colored Mercury parked in the Schwegmann Bros.' parking lot shortly after the murder. The blow-up is actually part of a crime-scene photograph taken immediately after the murder. Apparently, the police discovered what they believed was Kyles' car well after the time of the crime. The photograph shows only a small fraction of the right side of a tan, orange, or perhaps rust colored American-made car, which appears to be a two-door model and which has a vinyl top. It is impossible to discern the make or model of the car. The State also offered two pictures of Kyles' rust-colored Mercury, which also has a vinyl top, although the

pictures only depict the car from the front and back; the photograph of the back of Kyles' car is of limited value since the trunk is open, which blocks the vast majority of the backside. There is no way to identify whether the vehicle in the crime-scene photograph is Kyles' car. Thus, the State's photographic evidence here is of extremely limited -- if any -- probative value.[84]

Finally, it seems that at least some weight should be given to the many witnesses who testified in Kyles' defense. Numerous witnesses testified that Beanie Wallace was not only in possession of a bright red automobile resembling Mr. Dye's car immediately after the time of the murder, but also that Wallace was anxious to sell the car. Those witnesses also testified that Wallace's hair was braided. Although those witnesses were either friends or family of Kyles, at least two of them -- Ronald Gorman and Johnny Burnes -- were also friends of Wallace.[85] Another of those witnesses, Kevin Black, was employed as a security guard for the

---

[84] I am curious as to why the State did not offer a photograph of Kyles' car from the same angle as the car depicted in the crime-scene photograph -- which would have greatly facilitated a comparison. The crime-scene photo reveals the angle of the vinyl top on the car and also shows a large metal strip of molding that runs along the edge of the vinyl top. The State's photographs of Kyles' car reveal neither the angle of his vinyl top nor whether there is metal molding comparable to that on the car in the crime-scene photograph. The small portion of the vinyl top of Kyles' car appears *not* to have metal molding running along the edge, although I cannot be certain from the State's photographs.

[85] In Wallace's first recorded statement, he repeatedly refers to Johnny Burnes as his "partner" and housemate. In a subsequent statement, Wallace stated that he drove around the French Quarter with Gorman on the night after the murder.

municipal airport in New Orleans -- a position of some trust, which reflects positively on his credibility.  Two defense witnesses also testified that Beanie Wallace had romantic aspirations for Pinkie Burnes, thus providing an additional motive for Wallace to frame Kyles.[86]

## III.

In conclusion, after a painstaking review of the entire record, I am convinced that Curtis Lee Kyles should receive a new trial.  As a result of both a series of <u>Brady</u> violations and a related ineffective-assistance-of-counsel violation, Kyles' jury was not permitted to consider much of the relevant evidence.  Because my confidence in both the jury's guilty verdict and death sentence are undermined, I would grant the writ of habeas corpus.

Judge Learned Hand once wrote that "[o]ur procedure has always been haunted by the ghost of an innocent man convicted.  It is an unreal dream." <u>United States v. Garrson</u>, 291 F. 646, 649 (S.D.N.Y.

---

[86] As discussed in connection with Wallace's first recorded statement, it was also obvious that Wallace hoped to receive remuneration for assisting the police.  As he told police during the September 22 conversation, "I ain't doin' this for nothing, you know."  An additional motive is evident from statements that Wallace made during the first recorded conversation with New Orleans police.  Among other things, Wallace stated:

    i) "I betcha . . . I can get in a lot of trouble with the shit?" -- making reference to the fact that he was in possession of Mrs. Dye's car;

    ii) "Am I going to jail?"; and

    iii) Wallace stated that he feared that "I would be charged" with Mrs. Dye's murder because "a [black] male . . . in his twenties" committed the murder.

1923).  I fear that in this instance it is not simply a dream.  I therefore dissent.

APPENDIX A

---

Curtis Lee KYLES

versus

John WHITLEY, Warden Louisiana State Penitentiary,

Angola, Louisiana.

Civ. A. No. 90-4031.

United States District Court, E.D. Louisiana.

March 24, 1992.

ARCENEAUX, District Judge.

ORDER AND REASONS

Petitioner Curtis Lee Kyles seeks a writ of habeas corpus testing his conviction of capital murder and his sentence of death. His execution was stayed by order of this court on November 2, 1990.

Procedural Background

On December 7, 1984, Curtis Lee Kyles ("Kyles") was convicted of first degree murder under La.Rev.Stat. 14:30 and was sentenced

94

to death. His conviction and death sentence were affirmed by the Louisiana Supreme Court in State v. Curtis Lee Kyles, No. 86-KA-0800,[87] which was rendered on September 9, 1987; rehearing was denied on October 17, 1987. Petitioner then applied to the Supreme Court of the United States for a Writ of Certiorari which was denied without evidentiary hearing on May 23, 1988; rehearing was denied on August 17, 1988.

On January 2, 1989, Kyles petitioned the Criminal District Court for the Parish of Orleans, State of Louisiana, for a Stay of Execution, Post-Conviction Relief, Writ of Habeas Corpus, Evidentiary Hearing, and Motion for New Trial on the basis of newly discovered evidence. Kyles alleged in this petition that his constitutional rights had been violated in twenty ways. Kyles was not granted an evidentiary hearing, and his application was denied on January 6, 1989. This decision was appealed to the Louisiana Supreme Court by Application for Supervisory Writ. The Louisiana Supreme Court granted the application for the writ and ordered an evidentiary hearing in the criminal district court.

An evidentiary hearing was conducted intermittently from February 20, 1989, to June 1, 1989. Judge Dennis Waldron of the Criminal District Court for the Parish of Orleans denied petitioner's motions and rendered a judgment.[88]

---

[87]513 So.2d 265 (La. 1987), cert. denied, 486 U.S. 1027, reh'g denied, 487 U.S. 1246 (1988).

[88]Judge Waldron has presided over all of the proceedings in this matter in criminal district court.

On April 2, 1990, petitioner filed an Amended and Supplementary Application for Supervisory Writs to Review Final Judgment of the Criminal District Court for the Parish of Orleans, Section "F", denying State Order and Post Conviction Relief. On September 14, 1990, the Louisiana Supreme Court in a 5 to 2 opinion, denied the application without reasons.

On September 28, 1990, the Louisiana Supreme Court denied a motion for a stay order and suggested that Kyles apply to the federal court system.

On October 2, 1990, Judge Waldron issued a Warrant of Execution ordering Kyles to be executed on November 8, 1990. Kyles then petitioned the United States Supreme Court to stay the execution. The Supreme Court denied that motion on October 26 1990.

Kyles then filed the instant petition requesting a stay of execution under 28 U.S.C. s 2254. After having filed the petition, Kyles supplemented it by adding a claim that the electric chair, then in use in Louisiana, violated his constitutional rights. This claim had not been exhausted in the state court system; therefore, this court allowed Kyles to withdraw the supplemental petition to pursue those claims in the Louisiana court system.

The criminal district trial court denied defendant's electrocution-based writ application. Kyles then applied for writs to the Louisiana Supreme Court which were denied on May 24, 1991. On June 5, 1991, the court received notification of the Louisiana Supreme Court's decision and a request that it take up this issue

96

as well as those held in abeyance at that time. Kyles objected to this course of action because he intended to raise the electrocution issue by writ to the United States Supreme Court.

On June 25, 1991, Louisiana changed its method of execution from electrocution to lethal injection. The law became effective on September 25, 1991, thereby mooting this issue.

This court ordered additional briefing concerning any developments in the law since the time that the petition was originally filed which briefing was received in early September of 1991.

The Court has reviewed in detail, inter alia, the transcripts of the hearing held on Kyles' motion to suppress identification and on his motion to suppress evidence; the trial transcript and evidence adduced in that proceeding; and the post-trial proceedings transcripts and the evidence adduced there; the copious pleadings, briefings, exhibits, and statements filed in conjunction thereto, and the applicable law. The Court firmly believes that Kyles was given a fundamentally fair trial with able assistance by counsel. For the reasons that follow, the Court rejects Kyles' petition for habeas corpus relief.

### Facts of the Case

At approximately 2:20 p.m. on September 20, 1984, Mrs. Dolores Dye, a 58-year old white female was murdered in the parking lot at Schwegmann's Giant Supermarket at 5300 Old Gentilly Road, New

Orleans, Louisiana.[89]    Four people who witnessed the incident testified at the trial.

The testimony established that a black man accosted the victim as she placed her groceries in the trunk of a red Ford LTD.  One witness testified that the victim threw her purse into the trunk, slammed the lid, and tried to get away.  The assailant chased her and wrestled her to the ground.  When she attempted to escape again, the robber grabbed her arm, drew a revolver from his waistband, and fired it into her left temple, killing her instantly.  The gunman then took her keys from her hand, got into her car, and drove slowly from the parking lot.

The police were aided in their investigation when on Saturday night at about 10:00 p.m. Joseph "Beanie" Wallace informed police investigators he had purchased a red Ford LTD the previous day from defendant.[90]  The police determined that the car was registered in the victim's name.

After having ascertained Kyles' name and address from Beanie, who specifically pointed out Kyles' apartment to the authorities,

---

[89]The facts of this case are set out in great detail in State v. Kyles, 513 So.2d 265 (La. 1987).  It should also be noted at the outset that the first trial of Kyles for this murder ended in a mistrial after four hours of deliberation by a jury. This conviction arises from a second trial.

[90]At the post-conviction hearing, Detective John Miller testified that he had spoken to Beanie on no more than half a dozen occasions concerning various, unrelated shootings.  This instance was the first that Detective Miller could use Beanie's information because it was a homicide.  (Transcript of Post-Conviction Relief Hearing, Detective Miller, February 24, 1989, at 3.)  The court notes this fact because of petitioner's allegations that Beanie was an unreliable source.

the police picked up five identical sacks of garbage outside of his home at approximately 1:00 a.m. on September 24, 1984. Inside one of these garbage bags, the victim's purse and personal belongings were found. At 6:07 p.m. on September 23, 1984, a search warrant for Kyles' house was issued.

At approximately, 10:00 a.m. on the 24th of September, 1984, Kyles was arrested outside his home. Police recovered a .32 revolver, which was later determined to be the murder weapon, from behind the stove in his kitchen, as well as a hand-made holster, which fit the murder weapon and which was found in a chifferobe in the hall, various boxes of ammunition containing bullets which could be used in the murder weapon, and a rifle. In a kitchen cabinet, the police found groceries in Schwegmann's bags, including brands of dog and cat food normally purchased by the victim.

Partial fingerprints were found on the victim's effects, but none was sufficient for a positive identification. No fingerprints were found on the .32 revolver or in the LTD, although defendant's prints were recovered from a Schwegmann's cash register receipt found on the floor of the car. However, the chemical process used to raise the fingerprints on the register receipt destroyed the inked printing on the paper, thus making it impossible to determine what the receipt was for or when the purchase was made.

Three of the eye-witnesses to the murder picked defendant out of photographic line-ups conducted on September 24, 1984. These witnesses, as well as a fourth who had not been asked to make a

99

photographic identification, also positively identified defendant at trial as the murderer.

The defense contended at trial that the informant, "Beanie" had actually committed the murder and had framed Kyles. The defense presented several witnesses who saw Beanie in a red car similar to the victim's about an hour after the killing.[91] Other witnesses testified that Beanie had attempted to sell the car shortly after the murder.

The linchpin of the defense, however, was the defense's theory that Beanie had planted all of the incriminating evidence on Kyles. Evidently, a Sunday dinner was served at Kyles' "home"[92] on September 23, 1984. Testimony conflicted greatly as to the number of adults present at the meal and what was served. The defense maintains that it was then that Beanie framed Kyles.

To that end, Johnny Burnes, Kyles' common-law-brother-in-law, testified that he saw Beanie stoop down behind the stove where the gun was found. (Trial Transcript, Burnes' Testimony, pp. 259-89, at 263.) Kyles testified that the holster was not his and must have been planted in the chifferobe. The same explanation was given with respect to all of the ammunition. Kyles further testified that the rifle found belonged to Beanie. He explained

----

[91]All of these witnesses were either close friends of the defendant or related to the defendant's girlfriend and mother of his children, "Pinky" Burnes.

[92]The cour uses the term "home" loosely. The apartment in question was the apartment of Kyles' girlfriend where she resided along with her four children by Kyles and where he evidently stayed with some frequency.

that because Kyles had lent Beanie $20.00, Beanie had given him the rifle as collateral. (Trial Transcript, Kyles' Testimony, pp. 318-374, at 319). The motive for this "frame job" was Beanie's alleged romantic interest in Martina "Pinky" Burnes, Kyles' common-law wife and mother at that time of four of his children, as previously noted.

Kyles denied any involvement in the shooting, explaining his fingerprints on the cash register receipt by asserting that Wallace had picked him up in a red car the day after the murder and had taken him to Schwegmann's where he purchased transmission fluid for his car and a pack of cigarettes. He suggested that the receipt might have fallen from the bag when he removed the cigarettes. As to an explanation concerning the presence of dog and cat food, there was varying and conflicting testimony from all of the defense witnesses as to whether or not Kyles or his children had a dog or cat.

On rebuttal, Beanie was brought into the courtroom. Each of the four eye-witnesses attested that Kyles, not Beanie, was the person that each saw commit the crime. The jury and the court were given the opportunity to see any possible resemblance between the two.

After being charged and deliberating, the jury unanimously found defendant guilty of first degree murder.

In the sentencing phase, the prosecutors relied on the evidence adduced during the guilt phase of the trial. The defense called two of the defendant's sisters and two of his brothers who

testified that defendant had a close relationship with his children and loved and supported them. Defendant also took the stand and continued to assert his innocence.

The jury unanimously recommended the death penalty, finding as the sole statutory aggravating circumstance that the killing occurred during the commission of an armed robbery.

At the post-conviction hearing ordered by the Louisiana Supreme Court, the trial court received testimony concerning twenty issues, among other things, alleged Brady materials which had not been turned over to defendant, ineffectiveness of counsel, and approximately 18 other violations. After the hearing which was conducted on intermittent days, Judge Waldron issued a judgment denying Kyles' motion for a new trial and the relief sought in his Writ of Habeas Corpus.

As previously stated, petitioner then filed an Amended and Supplementary Application for Supervisory Writs to Review Final Judgment of the Criminal District Court for the Parish of Orleans on April 2, 1990. After the Supreme Court of Louisiana denied writs without written reasons, the same issues were raised by counsel for Kyles in the instant s 2254 petition which the Court will now address.

### Issues Presented

I. Denial of Motion for Stay of Execution, Evidentiary Hearing and Motion for a New Trial

Kyles claims a violation of his due process rights under the Sixth, Eighth and Fourteenth Amendments to the United States

Constitution because Judge Waldron denied his Motion for Stay of Execution, Evidentiary Hearing and Motion for New Trial without a hearing on January 6, 1989.  Petitioner states, "Based upon the true allegations set forth in the Application for Supervisory and Remedial Writs, Curtis Kyles should have prevailed."

First, it appears from the recitation of the procedural history of this case as supplied by Kyles that the Supreme Court ordered an evidentiary hearing in Criminal District Court on the motion for new trial and the writ of habeas corpus contained in defendant's January 2, 1989, pleadings, which hearings were conducted over a period of months from February 20, 1989 to June 1, 1989, and which served as the basis for Judge Waldron's judgment dated November 9, 1989.  Thus, it seems illogical to argue that Kyles' rights were violated when the Supreme Court of Louisiana, acting upon Kyles' applications for relief, ordered a hearing for that precise purpose and the criminal district court obeyed that order.

Furthermore, as previously noted, filed in conjunction with the motion for new trial and motion for an evidentiary hearing, was Kyles' application for a writ of habeas corpus.  As such, the state court proceedings of which Kyles complains were collateral in nature and not direct challenges to the validity of his conviction. The state court's alleged error in the conduct of its habeas proceedings presents no constitutional violation.  See Byrne v. Butler, 845 F.2d 501, 509-10 n. 8 (5th Cir.), cert. denied, 487 U.S. 1242, 108 S.Ct. 2918 (1988); Millard v. Lynaugh, 810 F.2d

103

1403, 1410 (5th Cir.), cert. denied, 484 U.S. 838, 108 S.Ct. 122 (1987). This claim is without merit.

II. Brady Violations

Kyles maintains that the state failed to meet its obligations to provide to defendant exculpatory materials under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny. The materials claimed to have been wrongfully withheld are:

A. a recorded statement obtained when the officers, following up on Beanie's phone call concerning Mrs. Dye's vehicle, met Beanie;

B. a computer print out which listed license plate numbers of the cars in Schwegmann's parking lot on the evening of the murder;

C. an inter-office memorandum directing Kyles' garbage to be picked up with the implication that evidence was to be found therein.

The suppression by a prosecutor of evidence favorable to and requested by an accused violates due process when the evidence is material either to guilt or to punishment, irrespective of the prosecutor's good or bad faith under Brady. Id. However, the non-disclosed evidence must be material. The suppression of evidence violates due process "only if it deprives the defendant of a fair trial." United States v. Bagley, 473 U.S. 667, 678, 105 S.Ct. 3375, 3381 (1985). "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

104

A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id., 473 U.S. at 682, 105 S.Ct. at 3383.

Petitioner has urged this court to adopt a heightened standard in this instance in relation to the "harmful effect of withheld exculpatory evidence in capital sentencing." (Memorandum of Facts and Law filed in conjunction with Petition at 40). Kyles urges instead to use the "no effect" standard found in Caldwell v. Mississippi, 472 U.S. 320 (1985), or the "harmless beyond a reasonable doubt" standard referred to in Satterwhite v. Texas, 486 U.S. 249 (1988). While this court declines petitioner's invitation to use these different standards in its analysis, it notes that even if it did, it would find that the evidence withheld did not have any adverse-due process effect, no matter which of the three standards were applied.

A. The Recorded Statement

The recorded statement at issue was made by the police simply as a precaution for the officer who was wearing the "wire." The police file was not turned over the district attorney until after the trial. Thus, the prosecution did not have the information to turn over in a timely fashion.

Kyles alleges that had he had the tape recording he would have learned that:

1) Beanie knew in what area of Schwegmann's parking lot the murder was committed;

2) Beanie had said that Kyles wore a "bush" hairstyle in contrast to testimony that the killer had "plaits";

3) Beanie asked for $400 for the purchase price of the victim's car and was assured by the police that he would be paid;

4) Beanie suggested to the police officers that Kyles might put incriminating evidence in his garbage; and

5) Beanie feared apprehension because he had been seen driving the Dye automobile.

First, the characterization of these "facts" being established by this tape as argued in Kyles' petition is not a fair rendition of the material contained in the tape itself. Secondly, the material does not exculpate Kyles. Finally, as to fitting "hand in glove" with the defense's position that Beanie framed Kyles, the fact is that after reviewing all of the testimony presented, the defense's theory has no viable or credible evidence to support it. In this court's judgment, the jury's verdict would not have been different had this information been available to the defense.

B. The Computer Print-Out

With respect to the computer print-out, at the evidentiary hearing, the defense learned that the list was not a complete list of the cars in the lot at that time; therefore, it is evidence which would carry little if any exculpatory weight and bears so little materiality that it fails to fit the Brady mold. (Post-Conviction Hearing, Detective John Miller, February 24, 1989, at 11).

106

C. The Inter-Office Memo

The court rejects the <u>Brady</u> argument with regard to the interoffice memo concerning the statement that "[w]e have reason to believe the victim's personal papers and the Schwegmann's bags will be in the trash." First the only "garbage" statement contained in the transcript of the tape is Sergeant Eaton's recital that Beanie said, "his garbage goes out tomorrow said if he's smart he'll put it in garbage. He said but he ain't that smart."(sic)[93] Sergeant Eaton did order the garbage to be picked up, but the bags that were picked up were identical, which renders improbable, if not impossible, the defense's argument that Beanie planted a bag of garbage.

To that end, the defense asks this court to rely on the hearsay statement of Martina "Pinky" Burnes, who defense counsel Martin Regan said that he could not rely upon in preparing Kyles' defense. Pinky stated that Steve Turner, who lived with the Burneses (as did "Beanie"), told her that he saw Beanie take a garbage bag and fill it with garbage from the neighbors' trash on North Dorgenois Street in the evening hours of Sunday, September 23, 1984, "apparently to drop off the garbage bag in which he had placed Mrs. Dyes' purse in front of Curtis' residence." (Post-Conviction Hearing, Testimony of Martina Burnes, April 7, 1989, at 21-22). In order to give any credence to this story,

----

[93]Eaton also testified that the transcript of the tape was incorrect in that Eaton is the one who made the comment that "[Kyles] was not that smart," because Eaton "did not want Beanie to have any knowledge of what [Eaton] may do later." (Post-Conviction Hearing, Sergeant Eaton, March 3, 1989, at 65).

Beanie would have to have known and used the same type garbage bags that Kyles used since they all resemble one another. This court finds Martina's testimony incredible considering that she had the opportunity to raise these points before Kyles' trial and did not.

A complete reading of the record convinces this court of Kyles' guilt and that he received a fair trial. The positive identification by four witnesses of Kyles as the perpetrator when each witness was given the opportunity to view Kyles and Beanie together, combined with the jury's opportunity to compare these two individuals to decide whether they had a reasonable doubt that Beanie could be mistaken for Kyles, combined with the varying and inconclusive testimony of Kyles' friends, leads this court to the ineluctable conclusion that the <u>Brady</u> materials were not material, that they would have made no difference in the outcome of this trial, and that there is no probability (much less a reasonable probability) that disclosure of any of the so-called "<u>Brady</u> materials" would have changed the result of the proceedings.

III. Ineffective Assistance of Counsel

Kyles has alleged nine errors of counsel prior to trial, nine errors of counsel during trial, and two errors after trial, which Kyles claims resulted in his having been denied effective assistance of counsel in contravention of his Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment rights. Defendant asserts that had he received effective assistance of counsel "there is a reasonable probability, if not a certainty, that the outcome of both the guilt

108

phase and the sentence phase of his trial would have been different. <u>Strickland v. Washington</u>, 466 U.S. 668 (1984)."

Under Strickland, Kyles is required to satisfy a two part test to merit relief on claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient ... that counsel was not functioning as the "counsel" guaranteed ... by the Sixth amendment. Second, the defendant must show that the deficient performance prejudiced his defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

<u>Id</u>., 466 U.S. at 687, 104 S.Ct. at 2064. Only if petitioner proves both elements, is he entitled to relief.

"The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." <u>Strickland</u>, 466 U.S. at 690, 104 S.Ct. at 2065. However, this means that the court must not employ hindsight in making its fair assessment of defendant's claims. The court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. <u>Id</u>. 466 U.S. 690, 204 S.Ct. at 2066; <u>Earvin v. Lynaugh</u>, 860 F.2d 623, 625 (5th Cir.1988), <u>cert. denied</u>, 489 U.S. 1091, 109 S.Ct. 1558 (1989).

Second, Kyles must demonstrate that there is a reasonable probability that but for counsel's conduct, the result of the

proceeding would have been different. Strickland, 466 U.S. at 697, 104 S.Ct. at 2069. As stated by the Strickland court:

> The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors. When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that absent the errors, the sentencer--including an appellate court, to the extent it independently weighs the evidence--would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.
>
> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by

errors than one with overwhelming record support. Taking the unaffected findings as given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

Id. 466 U.S. at 697-98, 104 S.Ct. at 2068-69.

Finally, this circuit has held that if a state court record is clearly adequate to fairly dispose of the claims of inadequate representation, further inquiry is unnecessary. De Luna v. Lynaugh, 873 F.2d 757 (5th Cir.1989), cert. denied, 493 U.S. 900, 110 S.Ct. 259 (1989). In this instance, the court finds that the state court record meets this standard, and thus, this court will not entertain another evidentiary hearing.[94]

Within this framework the following issues were raised by petitioner:

A. Ineffective Assistance Prior to Trial[95]

---

[94]It is important to also note that a state court's findings of fact are entitled to a presumption of correctness under § 2254(d) unless one of the eight exceptions is present. 28 U.S.C. § 2254(d). The presumption of correctness extends to implicit fact findings. Thompson v. Linn, 583 F.2d 739, 741-42 (5th Cir. 1978).

[95]Petitioner had Attorney Samuel Dalton testify at the post-conviction evidentiary hearing. Mr. Dalton was presented as an "expert" in defense of death penalty cases. As a hired expert, it is not surprising that he opined that with all of the "errors" committed by counsel Martin Regan, an entirely different trial would have ensued. However, this court cannot approach this question as though it has no experience in trial advocacy and the rigors of criminal cases.

111

1. Kyles alleges that counsel was ineffective with respect to the motion to suppress evidence recovered from the garbage, because he did not call as a witness Detective Miller, another policeman involved in the investigation who, defendant maintains, would have testified that the garbage was picked up because of Beanie's tip.

This claim is without merit for various reasons. To begin with, defendant has no constitutional right of privacy in his garbage. California v. Greenwood, 486 U.S. 35, 108 S.Ct. 1625, 1628-30 (1988); United States v. Vahalik, 606 F.2d 99, 100-01 (5th Cir.1979); Louisiana v. Kyles, 513 So.2d 265, 269 (La.1987). Therefore, it is irrelevant how the police decided to pick up those five bags. Next, this assertion is based on information obtained after trial which this court is not allowed to consider as discussed above. Thus, this assertion does not state a valid ineffective assistance claim.

2. Kyles asserts that it was ineffective assistance for Regan not to have moved for a continuance to ascertain from residents around 2313 Desire St. (Pinky's residence) how many bags of garbage they put out on the day in question and whether they saw anyone else place a garbage bag in front of the house. This argument, again, is based on defendant's post-trial hindsight which the court

---

In the instant matter, Mr. Regan was retained counsel for Kyles. Mr. Regan has appeared before this court under similar circumstances, albeit never in a capital case, on numerous occasions. The court notes for the record that Mr. Regan has consistently conducted himself as an extremely careful and zealous defense lawyer.

It is impossible for this court to place much credence in this "expert's" opinion.

112

will not consider as providing evidence of allegedly deficient trial conduct. Furthermore, from the evidence, it is apparent that all of the bags were the same and were "lined up" when picked up indicating that they probably came from Kyles' apartment.

3. Petitioner argues that counsel erred in his failure to interview Steven Turner, who allegedly told Martina ("Pinky") Burnes that he saw Beanie fill a garbage bag and leave his house on North Dorgenois. (See discussion, <u>supra</u>). Again this claim goes back to the alleged "tip" from Beanie about the garbage of which counsel had no knowledge when his alleged failure to interview Turner would have had any relevance. In addition, it would appear that counsel was unaware of Turner's alleged discussion with Pinky. As such, the allegation is based on hindsight which the court will not consider. Furthermore, the picture in evidence of the five garbage bags belies this story in its entirety.

4. Regan was also allegedly ineffective because he failed to investigate and interview Marrian Burnes who allegedly saw the murder weapon in Beanie's possession one or two weeks prior to the murder. This information is so inconsequential in relation to the rest of the evidence that it cannot be said that the result of the proceeding would have been different had Regan known; therefore, no prejudice is demonstrated.

5. Regan's failure to interview the eye-witnesses of the shooting was erroneous and prejudiced Kyles, the defendant claims. The Court finds no merit in this argument. Regan had more than adequuKMRGCMND():!A]jtunily ho cross-examine three of the

113

eye-witnesses at the motion to suppress--when all were under oath.[96]

His election not to further interview them or obtain statements was not unreasonable and appears to have been in the nature of a reasonable, tactical decision on the part of defense counsel that the court will not second guess.  In addition, Kyles has not presented how such witness interviews would have resulted in a different trial outcome.  The trial in question was fundamentally fair.

6. Kyles claims that counsel should have demanded an in camera review of the homicide file.  This entire claim is based on hindsight and as such is not subject to review by the Court. Furthermore, considering that the Court has previously ruled that the failure to turn over this Brady material did not result in Kyles receiving an unfair trial, this claim is without merit.

7. Kyles argues that counsel was "patently ineffective in allowing the state to hide such significant evidence" as the taped conversation.  As this court has stated, this "taped conversation" looked at in the light of all of the other evidence adduced at

---

[96]Regan cross-examined Isaac Smallwood, Henry Williams and Robert Territo at a motion to suppress held on November 6, 1984, all of whom testified at trial.  Only Darlene Cahill, the fourth trial eye-witness was not questioned and that is because she had not participated in the photographic line-up at issue therein.

The Court notes that the identifications made by each of these persons was absolute.  Much has been made over Smallwood having embellished his recounting of what he saw on the day of the shooting at trial.  However, comparing his statement, his testimony at the hearing on the motion to suppress, and the testimony at trial, this court believes that at a minimum this individual was able to see the perpetrator's face and that the identification is valid.  Smallwood's embellishment is not prejudicial error.

trial and at the post-conviction hearing, is not the "smoking gun," as defense counsel insists on characterizing it. In addition, this is yet another "hindsight" call which the court will not consider.

8. Counsel was ineffective because he did not advise two of the defense witnesses to go to the police or the district attorney with "information ... that Beanie was the murderer of Dolores Dye" which information counsel learned "at least two weeks after Curtis' arrest." This assertion by Kyles overstates at best, or misstates at worst, what this court can glean from the record.

The citations provided by counsel to support this claim do not deal with these two persons having informed Regan two weeks after Kyles' arrest that Beanie was the murderer of Dolores Dye. The Regan testimony of February 20, 1989, at the Post-Conviction Hearing beginning at page 17 deals with Beanie's allegedly having murdered two other people. Kevin Black's entire testimony consists of his having seen Beanie in the Dye car immediately after the shooting. Johnny Burnes most incriminating statement at trial about Beanie was that he saw Beanie placing something behind the stove at the now infamous Sunday night dinner.

To begin the analysis, the criminal trial court found that Johnny Burnes testimony is totally without merit or worthy of consideration because of his demeanor in court and because he had been convicted of the murder of Beanie. This court concurs in this finding. Both Burnes' trial testimony and post-conviction hearing testimony are incredible. It was not until this post-conviction hearing (which occurred after Beanie's demise) that Burnes thought

115

about retrieving from his memory the "fact" that Beanie told him that Beanie had killed Mrs. Dye. Indeed, Sergeant Raymond Miller, who took Burnes' statement about Beanie's involvement with another (the Leidenheimer) murder, believed from Burnes' statement that Burnes himself was involved in that murder. (Post Conviction Hearings, Raymond Miller, March 3, 1989, at 46-47).[97]

As to Black's testimony, again the court cannot find that his being "discredited" by the fact that he did not go to the police had an effect on the fairness of the trial in light of the totality of the evidence adduced. Petitioner has not proven any prejudice resulted from the alleged error of counsel.

9. In petitioner's memorandum of facts and law, not in the petition itself, Kyles finally argues that Regan's failure to interview Beanie himself was error. However, this decision was one which was rationally made by a competent defense lawyer. Beanie was considered by Regan to be the proverbial "loose cannon." Considering that Regan's entire defense hinged on pinning the murder on Beanie, it is difficult to comprehend how interviewing Beanie would have made any appreciable difference. Surely, Kyles

---

[97]Miller testified concerning why he held this belief as follows:

> It was the information that, ah, he [Johnny Burnes] knew the caliber of the weapon. He knew the location of the wound, and most importantly, he knew the fact that a television had been moved from one location to another inside the downstairs's living room of the residence. That particular information in particular was never released to anyone, because I failed to put it in the initial daily by an oversight. So that particular information was not known to any one other than someone who would have been there that night.

116

could not have expected a Perry Mason confession from Beanie had Regan interviewed him.  This "error" was not prejudicial.

B. Ineffective Assistance During Trial

1.  A major issue raised in petitioner's post-conviction motions heard before Judge Waldron, repeated here, is that it was ineffective of counsel not to call Beanie to the stand.  Regan has opined that he did not do so because he misunderstood Louisiana law on that issue at the time;  he believed he would have to prove both hostility and surprise in order to lead Beanie if he called him. (Post-Conviction Hearing, Regan Testimony, February 20, 1989, at 23-24).

Louisiana Revised Statute 15:277 provided at the time of Kyles' trial:

A leading question is one which suggests to the witness the answer he is to deliver, and though framed in the alternative, is inadmissible when propounded to one's own witness, unless such witness be unwilling or hostile.

Louisiana Revised Statute 15:487 also provided at that time:

No one can impeach his own witness, unless he has been taken by surprise by the testimony of such witness or unless the witness shows hostility toward him, and, even then, the impeachment must be limited to evidence of prior contradictory statements.

It was only after the Louisiana Supreme Court, in dicta, stated that "Wallace [Beanie] was clearly a witness hostile to defendant, and defense counsel was entitled to employ leading question and to

117

impeach the witness through any prior inconsistent statements. La.R.S. 15:277; 15:487" that Regan's decision was called into serious question.

The Louisiana court's statement does not mean that the statutory requirements would not have to have been met by Regan. Had Regan put Beanie on the stand, he would not have been able to impeach him until Regan was either surprised by the testimony or Beanie demonstrated hostility. State v. Nuccio, 454 So.2d 93 (La.1984); State v. Rogers, 324 So.2d 404 (La.1975). At the time Regan was called upon to make the decision as to whether or not to call Beanie, Regan had no guarantees as to Beanie's demeanor or testimony. He made a logical decision which this court feels was justified at the time.

The possibility of the defense calling Beanie was actually considered by Regan and discussed with the prosecution. At the post-conviction hearing, prosecutor Cliff Strider in responding to the question whether Regan indicated to him whether Strider thought he would or would not call Beanie as a witness testified:

> He was debating that point. I remember that there was a discussion. I told him that I would love to get Beanie under cross-examination, and he made a remark about how that he would be able to do that, and so we'd both have him under cross-examination. There was a discussion--.... He made a remark about that Beanie would be hostile because he was going to be accusing him of the murder, and that he would be able to--I told him

118

that I didn't think Beanie would get hostile.  I didn't

think that Beanie would get upset.

(Post-Conviction Hearing, Testimony of Strider, February 20, 1989,

at 117.[)]

Considering the possible damage that Beanie's testimony could

have wrought and considering that much of the "evidence" of

Beanie's character and activities presented was based on

questionable hearsay, this court believes that Regan made a

tactical decision that was reasonable and well advised at the time

that he decided not to place Beanie on the stand.  This court must

indulge a strong presumption that counsel's conduct falls

within the wide range of reasonable professional

assistance; that is the defendant must overcome the

presumption that, under the circumstances, the challenged

action "might be considered sound trial strategy."

Strickland, 466 U.S. at 690, 104 S.Ct. at 2065.

In addition, the essence of the state's case did not rely at

all on Beanie; it was founded on the positive identification by

four eye-witnesses who saw Curtis Lee Kyles at varying stages of

the incident calmly placing a gun to the head of an unarmed woman,

blowing her brains out (for absolutely no other reason than to rob

her), and then driving away in her car.  The court cannot find that

the decision reached would reasonably likely have been different

had Regan cross-examined Beanie.

2. Kyles alleges that counsel was ineffective because he

failed to obtain the services of an eye-witness expert to prove

119

that the identifications were suspect. At page 94 of Regan's February 20, 1989, post-conviction hearing testimony, he states that he did not know of any case in the year 1984 in which an expert in eye-witness identification was used in the Criminal District Court for Orleans Parish. In light of that testimony, it borders on frivolous to raise such a claim under the dictates of Strickland. Because it was not the practice of the legal community in 1984 to use these experts, and their use was, therefore, without precedent at that time, Regan cannot be found to have been ineffective by not doing that which had never before been done.

3. Likewise, Kyles' argument that Regan should have impeached Smallwood, the eye-witness who embellished his story on the stand, with his prior statement is without merit. Regan did not know of it; therefore, an ineffective assistance of counsel claim in this regard is without merit. Furthermore, since the "Brady " evidence was found not to be material, its non-use could not present an ineffective assistance of counsel claim.

4. Kyles makes the broad-brush allegation that counsel's failure to interview all of the eye-witnesses constituted ineffective assistance. This claim fails to detail with particularity what prejudicial impact that failure produced, and therefore Kyles does not raise a cognizable claim.

5. Kyles claims as ineffective assistance Regan's failure to call Detective John Miller, the detective who met with Beanie, to the stand. During the post-conviction hearing, Detective Miller was called to testify. There was no testimony elicited from him

120

that would have in any way diminished the state's case against Curtis Lee Kyles. Accordingly, no prejudice has been demonstrated by Kyles; this claim also fails.

6. The next claim is based upon counsel's alleged failure to properly argue the State's objection to Ronald Gorman's testimony as hearsay. At the trial Gorman testified that Beanie had attempted to sell Mrs. Dyes' car to Gorman. Gorman also had been convicted "on a marijuana charge" and "armed robbery that they broke it down to purse snatching." Trial Transcript at 238-39. Indeed, Gorman testified how different Beanie and Kyles appear. Trial Transcript at 244.[98]

Kyles does not specifically outline exactly what testimony Gorman would have given. He notes that "[h]owever, had trial counsel noted that a statement against penal interest is an exception to the hearsay rule, the statements made by Beanie to Ronald Gorman would have been admissible." Petitioner gives no specifics, and on that basis the court rejects this contention.

In addition, in reviewing the trial testimony and the post-conviction testimony with respect to Gorman, Gorman was a convicted felon whose testimony was and continues to be suspect. Therefore, the court cannot find that Kyles was prejudiced by Regan's "failure" in this regard.

_____

[98]Gorman was one of the individuals who went to the police after the first trial and gave a statement concerning Beanie and the Leidenheimer murder. In the statement, Gorman admitted that he had known of the Leidenheimer information for a number of months but had decided to tell the police only then because Beanie supposedly threatened to murder him if Gorman testified at trial.

7. Kyles raises a similar objection with regard to Johnny Burnes testimony and counsel's failure to raise an exception to the hearsay rule. The trial court stated after the post-conviction hearing:

> This Court, having had the opportunity to view Mr. Burnes on the witness stand and to hear his testimony, has chosen to totally disregard everything that he has said. Purely by coincidence, this Court has presided over the trial of Mr. Burnes, wherein he was convicted of the killing of Joseph Wallace [Beanie].

Judgment dated November 9, 1989, at 4.

The trial court's finding of fact in this regard cannot be set aside unless it is clearly erroneous. The court must give due regard to the opportunity of the trial court to judge the credibility of the witnesses. Amedeo v. Zant, 486 U.S. 214, 223, 108 S.Ct. 1771, 1777 (1986). Having reviewed the entire record, this court without hesitation concurs with the trial court's determination concerning the credibility of Johnny Brown.

Burnes still denies that he killed Beanie, and testified at Kyles' post-conviction hearing that the prosecutor, Mr. Strider, whispered to Burnes outside the courtroom, "He told me whatever they had to do to get me, they was going to get me, too." (Post-Conviction Hearing, Burnes' Testimony, March 1, 1989, at 54). Even at the trial, before Beanie's murder, Burnes' testimony is uneven and unbelievable.

122

Based on these findings, there can be no prejudice with regard to any testimony that Burnes was precluded from giving.

8. Kyles opines that counsel failed in providing assistance when Regan did not object to the introduction of a picture and its blow-up which purportedly shows Kyles' car in the Schwegmann's parking lot at the time of the murder. It is simply yet another ex post facto claim which has no merit as the basis for an ineffective assistance claim. The gravamen of petitioner's argument is that the police record of the license plates supposedly demonstrates that Kyles' car was not in the parking lot at 9:15 p.m., the night of the murder.

As noted earlier, at the post-conviction evidentiary hearing it was established that the list did not contain the license plate numbers of every car in the lot. Furthermore, even if this list were conclusive, Regan did not even know of the list at the relevant time.

9. Petitioner continues to claim ineffective assistance by arguing that counsel's failure to object to Detective Dillman talking about two other witnesses "probably persuaded the jury that there were more witnesses who could identify the defendant." (Trial testimony at 88). This claim is totally unsupported by the record. The two other witnesses are Willie Jones and Edward Williams. These two persons participated in the photographic line-up, but were unable to make a positive identification, only a tentative one, as specifically stated by Dillman at trial. He also testified that they did not make a negative identification, that is

123

identify someone else.  Furthermore, this "failure" could not be deemed to have resulted in Kyles' receiving a fundamentally unfair trial when four eye-witnesses testified unequivocally that Kyles was the perpetrator of the crime.

10. Kyles argues that Regan was ineffectual when he failed to object during the sentencing phase to a comparison of Kyles' life while incarcerated to the Dye's family life subsequent to the murder of Mrs. Dye.  This "failure" does not constitute constitutional grounds to vacate the sentence.  Under the Supreme Court's ruling in Payne v. Tennessee, --- U.S. ----, 111 S.Ct. 2597, 2606-08 (1991), it is not unconstitutional to introduce at the sentencing stage information concerning the impact on the victim's family because of the victim's death.  "We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm cause by the defendant."  Id.

11. Kyles' last contention is that counsel was ineffective for his "failure to investigate the possibility that Kyles' has organic brain damage or mental illness."  First, counsel has not presented evidence that Kyles' suffering from:

> considerable inter- and intra-test scatter. Deficiencies
> appear in areas of perceiving and mobilizing information
> in the environment, academic knowledge, abstract
> reasoning and short-term memory

124

(Petition at 47) would affect his capacity to stand trial or to be sentenced as he was. Second, there is no evidence of any facts or triggering events which would have alerted Regan to the desirability of ordering such tests. Counsel testified that Kyles was lucid and perfectly capable of understanding everything that went on at trial and assisting counsel at that time. "He was certainly sane and capable of assisting me." (Post-Conviction Hearing, Testimony of Regan, February 20, 1989, at 61). Regan was privately retained counsel, working within a budget. Id. at 62. Taking all of this into consideration, counsel's not ordering those kinds of tests was reasonable under prevailing professional norms at the time.

C. Ineffective Assistance Following Trial

1. Kyles alleges that had Regan "kept in contact with Curtis' family during the appeal of the conviction and death sentence, he would have learned that Beanie admitted to Martina Burnes and Johnny Burnes that Beanie killed Dolores Dye." The court has already expressed its findings with respect to Johnny Burnes' testimony. The court finds Martina ("Pinky") Burnes' "new" information equally incredible. She testified at the post-conviction hearing, responding specifically to the court's question,[99] that Beanie told her before Curtis was convicted that Beanie had shot Mrs. Dye. (Post Conviction Hearing, Martina

---

[99]As stated previously, Regan did not call her at trial because he was uncomfortable with her testimony and attitude even though the defense's version hinged on the theory that Beanie framed Kyles in order to get Pinky.

125

Burnes' Testimony, April 7, 1989, at 17-18). Certainly, it belies belief that had Pinky had this information at the time of trial that she would not have been forth-coming with it. Inherent in this claim also is the idea that defense counsel should continue "post-trial working" of evidence, a concept which, at the very least is novel, if not absurd. Surely, the burden of producing favorable or changed post-trial circumstances should rest with the defendant's family, not with his lawyers. They are advocates, not companions or sitters. This claim is without merit and warrants no more discussion.

2. Kyles final assignment of error in relation to the ineffectiveness of counsel is that he "could have also called Detective Ray Miller to the stand during a hearing on a motion for new trial on the basis of newly discovered evidence"--that being Beanie's confession about being present at the scene of the Leidenheimer murder. What this evidence has to do concerning new evidence in relation to Kyles' murdering Mrs. Dye is beyond this court's independent comprehension and is neither explained nor amplified by counsel. Beanie never took the stand. Beanie's testimony and good character were not an issue. Beanie supplied a name. That is virtually all he did.

In summary, with respect to all of the ineffective assistance of counsel claims, Kyles has not demonstrated that he was prejudiced by any of these alleged "errors," nor did Regan's defense fall below the standard required. Kyles received a fair trial; a jury found him guilty beyond a reasonable doubt, did so

126

on the basis of facts properly presented to it, and had ample evidence presented to it to do so.

IV. Other Errors in Trial Court

In addition to the foregoing, petitioner raised seventeen other "errors" which the trial court allegedly committed.

A. Kyles claims that the trial court erred when it did not appoint, without being asked, another attorney for the sentencing phase of the trial. To begin, Regan was not appointed counsel, so it is unclear why the trial court should interject itself into the business of retained counsel in that manner. Furthermore, as support for this proposition, Kyles asks the Court to look to State v. Williams, 480 So.2d 721, 728 n. 14 (La.1985), a case decided after this trial in which the court noted the possibility of a court appointing separate counsel for the sentencing phase of the trial. Neither statutory law nor the Louisiana Supreme Court mandate it. Furthermore, petitioner simply states in a conclusory way that this non-appointment violated Kyles' Sixth, Eighth and Fourteenth Amendment rights but does not specify how. Without specificity, the Court cannot address this allegation.

B. Kyles claims his Sixth, Eighth and Fourteenth Amendment rights were violated when his garbage was seized as the result of information given by an unreliable source. The petitioner was given a full and fair hearing based on a motion to suppress. As discussed earlier, petitioner had no reasonable expectation of privacy in the garbage; therefore, no constitutional error was

127

committed when its contents, those being the victim's purse and belongings, were introduced at trial.  Furthermore,

> where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.

Stone v. Powell, 428 U.S. 465, 482, 96 S.Ct. 3037, 3046 (1976). This claim is without merit.

C. Kyles complains that the trial court clearly erred in precluding answers from Detective Miller regarding his knowledge about Beanie's offering the victim's car for sale and stating whether he had changed the license plate.  Counsel at trial did not object to the trial court's evidentiary ruling, nor did counsel offer the justification that the testimony was admissible not for the truth of the statement, but for the proposition that the statement had been made.

This court must remember its role in reviewing the evidentiary rulings of state convicting courts.  An evidentiary error in state criminal trial justifies habeas corpus relief only if the error is such that it rendered the petitioner's trial fundamentally unfair. Bailey v. Procunier, 744 F.2d 1166, 1168 (5th Cir.1984).  An unfair trial is one that has been largely robbed of the dignity due a rational process.  Menzies v. Procunier, 743 F.2d 281, 288 (5th

128

Cir.1984). A state defendant has no constitutional right to an errorless trial. Bailey, 744 F.2d at 1168.

In Kyles' case in chief, the allegation that Beanie offered the car for sale after the murder was raised by Ronald Gorman (Trial Transcript at 234), and the allegation that Beanie changed the license plates was elicited on direct examination of Johnny Burnes. (Trial Transcript at 260). Thus, the jury was presented with these theories. Looking at the totality of the evidence presented and the manner it was introduced, the evidentiary rulings did not result in a fundamentally unfair trial.

D. Kyles opines that the failure of the trial court to voir dire the prospective jurors individually and privately tainted the venire when prospective jurors Gros and Miller stated that they believed the defendant was guilty. First, petitioner does not indicate that counsel ever made such a request, nor can this court locate such a request in the approximately 200-page voir dire transcript. Second, the citation of pages 92 and 93 in relation to "Gros'" testimony is not correct since the testimony of neither a Mr. nor Ms. Gros appears at those pages. Third, a review of the voir dire of Mr. Miller provides the clear view that Mr. Miller agreed that Kyles was innocent until proven guilty. Finally, there is no constitutional guarantee of individual voir dire. See Wingo v. Blackburn, 783 F.2d 1046, 1051-52 (5th Cir.1986); Salemme v. Ristaino, 587 F.2d 81, 88 (1st Cir.1978).

E. Kyles claims that his right to a fair trial and sentence were violated "by making reference to Kyles' alleged infidelity to

129

his common law wife." Petitioner gives no specific reference where the "cheap shot" occurred; however, Kyles himself testified that he had another girlfriend. This court finds it impossible to say that Kyles was denied a fundamentally fair trial because of any such reference when it was a fact testified to by the petitioner himself. (Trial Transcript at 331).

F. Petitioner claims he did not receive a fair trial when the prosecutor argued that none of the jurors would feel safe shopping at Schwegmann's. Trial counsel made an objection and it was sustained; however counsel failed to ask that the jury be admonished to disregard the statement.

The trial court instructed the jury at the end of the guilt phase that:

> the opening statement of the District Attorney, as well
> as the opening statement of the defense attorney, as well
> as all of their closing arguments, as well as all of the
> questions that they have asked during this trial, as well
> as all of their comments during this trial, are not in
> any way to be considered by you as evidence in this case.

Such a prophylactic instruction cures the alleged violation. Furthermore, the failure to admonish given the circumstances of the trial still would not result in a fundamentally unfair trial.

G. Kyles next raises the identical type of objection but in regard to the sentencing phase concerning a reference to Kyles' being able to watch cable television if sentenced to life at Angola. This court has not been able to find in the record that a

130

similar prophylactic instruction was given; however, the Louisiana Supreme Court observed that a review of the closing argument in its entirety led it to conclude that the prosecutor's improper remarks did not render the jury's sentencing recommendation unreliable. State v. Kyles, 513 So.2d 265, 275 (La.1987). This court concurs with the Louisiana high court's findings and will not disturb them.

H. Kyles claims that because the "sentencing paragraph of the relevant article states that the jury's decision is a 'recommendation' when in fact it is a mandatory sentence," the statute is unconstitutional, and the jury was mislead concerning the finality of their decision. This argument belies the instructions which Judge Waldron gave. In the case at bar, it is clear that the jury was apprised of the fact that its finding that Kyles should be sentenced to death would result in the imposition of that penalty. One of the statements made to that end (and the instructions are replete with similar statements) is as follows:

> Only if you find beyond a reasonable doubt that the aggravating circumstance outweighs any one or more mitigating circumstances and you are convinced beyond a reasonable doubt that the sentence of death is appropriate, may you impose that sentence. (emphasis added).

Nowhere in the instructions, is the jury given the impression that their verdict would simply be a "recommendation." Therefore, no constitutional right was violated.

I. In the sentencing phase, a juror asked the trial court whether a life sentence without benefit of parole, probation or suspension of sentence was "exactly carried out." Kyles argues that because the judge simply reiterated what the standard of proof for the finding of a sentence of death rather than directly answering the question "was misleading and deprived Curtis of fair sentencing hearing, violating his rights...."

Under Louisiana jurisprudence, the trial court responded in a proper manner. State v. Copeland, 530 So.2d 526, 538 (La.1988), citing State v. Lindsey, 404 So.2d 466, 487 (La.1981), after remand, 428 So.2d 420 (La.1983). "A discussion of future remedial measures increases the potential for arbitrary decision making by the jury and is irrelevant to the jury's duty. Thus, there is almost a blanket prohibition of these matters."

The trial court's response was not prejudicial and did not result in a fundamentally unfair trial. Indeed, if the trial court had done otherwise, it could well have committed error. The trial court adequately informed the jury of its option to sentence the petitioner to either life imprisonment or death. Evans v. Thigpen, 809 F.2d 239, 243 (5th Cir.1987). As such, the court's response was not prejudicial. This claim is devoid of substance.

J. Kyles claims his constitutional rights were violated because the first degree murder statutory scheme does not allow for a separate jury to be chosen for each phase of the trial based on his contention that such a scheme "would allow jurors who are opposed to the death penalty to serve during the guilt/innocence

132

phase, if otherwise qualified." The court finds neither statutory sanction nor constitutional justification for such a proceeding. In addition, other than offering an unsupported, if not interesting, theory of his perceptions of enhanced jurisprudential practice, petitioner does not demonstrate how the absence of such a "two jury" trial prejudiced him. The jury selection was fundamentally fair and the fact that those who do not believe in the death penalty were excluded from the guilt phase of the trial raises an issue that is wholly speculative in its nature and does not meet constitutional proportions. Furthermore, this issue was not raised in a petitioner's initial appeal and is arguably waived.

K. Kyles claims that he was deprived of a fair sentencing hearing because the prosecutor appealed in numerous ways to the passions of the jury. The Louisiana Supreme Court examined the record of the sentencing phase to determine if it was constitutionally excessive.

> In making this determination, the court considers whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor; whether the evidence supports at least one statutory aggravating circumstance; and whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the offender and the offense.

Kyles, 513 So.2d at 273. While the state supreme court recognized that the closing was surely undesirable, if not improper, in a number of ways, the court was unable to conclude that the

133

prosecutor's improper remarks rendered the jury's sentencing recommendation unreliable.  _Kyles_, 513 So.2d at 275.

This court having reviewed the record concurs with the Louisiana Supreme Court.  Some of the objectionable comments refer to what have become known as "victim impact statements."  In _Payne v. Tennessee_, --- U.S. ----, 111 S.Ct. 2597, 2609 (1991), the United States Supreme Court held that the Eighth Amendment does not establish a per se bar to the introduction of victim impact evidence where the State chose to permit the admission of victim impact evidence and prosecutorial argument.  This court believes that the statements made taken in the context of the whole did not render the verdict unreliable.

The jury found an aggravating circumstance which is sufficient under the Louisiana scheme to sentence Kyles to death.  Based on the record in its entirety, the evidence was overwhelming of Kyles' guilt.  There was little cause for doubt based on the four eyewitnesses' testimony that this defendant needlessly and with total disregard for the victim literally blew her brains out.  There was little, if any, mitigating evidence.  Even if the argument was inappropriate, it did not make the sentencing hearing unfair.  _See Kirkpatrick v. Blackburn_, 777 F.2d 272, 283-84 (5th Cir.1985).

L. Kyles contends that the prosecution argued that the alternative to the death sentence was only "life imprisonment" not mentioning that it would be without benefit of parole, probation or suspension of sentence.  This claim disregards the very explicit

134

instructions of the trial judge at the sentencing stage, disregards the very nature of closing arguments, and would cast the prosecution in the role of an apologist, which is neither his duty nor his purpose. The claim has no merit.

M. The petitioner argues that the death penalty was arbitrarily and capriciously imposed on him because the mitigating factor of "no significant prior criminal record" was present and because "no aggravating circumstances existed other than that required to be proved in order to convict the petitioner of the a (sic) murder." Surely, the state proved that which the law required it to prove; that the jury elected to forego Kyles' wish for more merciful consideration raises no federal constitutional issue. In Wingo v. Blackburn, 783 F.2d 1046, 1051 (5th Cir.1986), the United States Court of Appeals for the Fifth Circuit stated:

> We fail to see why aggravating circumstances narrow the sentencing discretion any less by being made a constituent element of the crime. The State of Louisiana is entitled to authorize capital punishment for persons guilty of these aggravated acts where the jury does not find that mitigating circumstances justify less than the death penalty.

See Lowenfield v. Phelps, 817 F.2d 285, 289 (5th Cir.1987), aff'd, 484 U.S. 231, 108 S.Ct. 546 (1988). Petitioner raises yet another baseless claim.

N. Kyles claims that his constitutional rights were violated when two defense witnesses, Kevin Black and Johnny Burnes, were

135

threatened by the prosecutor with being charged with accessory after the fact to first degree murder.  Kyles contends that after the trial court informed them of this problem and instructed them on their Fifth Amendment right against self-incrimination, the demeanor of the two witness changed radically and their effectiveness was diminished.

This court rejects this argument as did the Louisiana Supreme Court in Kyles, 513 So.2d at 271.  As stated before, Johnny Burnes' testimony is simply not credible under any circumstances, without any reference to his demeanor.  Kevin Black testified that he saw Beanie in the Dye car between 3:15 and 3:30 p.m. on the day of the murder and that Beanie had his hair fixed in braids or plaits at the time.  (Trial Testimony at 208-09).  In relation to all of the other evidence and testimony adduced, these witnesses' demeanor would not have caused the outcome of this trial to be suspect.  In addition the Louisiana Supreme Court found that if Beanie had provided the prosecutor "information ... indicating that Burns and Black facilitated defendant's attempts to avoid apprehension and destroy evidence, the prosecutor had a legitimate basis for considering prosecution under the accessory statute, La.R.S. 14:25 or the obstruction of justice statute, La.R.S. 14:130.1."  Kyles, 513 So.2d at 272 n. 6.

At the post-conviction hearing, Prosecutor Strider outlined the state's theory of the case as follows:

Because what happened was that Curtis Kyles shot that
lady, he took her car to ... Kevin Black's apartment, and

136

there is a place where you can park an automobile that you can't see it--behind Mr. Black's apartment, you can't see it unless you're standing right there. He then got, I believe Mr. Black, to drive him over to his house. They goofed off there for a little bit. Then they got Johnny Burnes to take Black, Burnes, Kyles and Beanie back to the parking lot where the car was, and Burnes went in and picked up the car, Kyles' car. And Black and Kyles and Beanie waited ... in the other parking lot while Johnny went over and picked up the car and drove it to Black's apartment complex, where they swapped the groceries from one car to the other car.

(Post-Conviction Hearings, Strider's Testimony, February 20, 1989, at 128-29). There was reason for Strider to ask for the court's intervention. This court cannot find constitutional error in the actions of the trial court.

O. Kyles claims that his rights were violated because the pro bono attorney appointed by the Louisiana Supreme Court has no previous experience in death penalty post-conviction relief cases. The claim is without merit considering that Gerard A. Rault, Jr., who is a professor of criminal law at Loyola Law School in New Orleans, Louisiana, is listed as "of counsel" on the pleadings and participated in the post-conviction hearings. Kyles has been well represented; he received a fair trial for the tragic murder of Mrs. Dye. He asserts his innocence in the face of overwhelming

137

evidence.  No attorney, no matter such attorney's brilliance and experience, can change the facts of a case.

P. Kyles claims that his sentence of death is "invidiously discriminatory" because of Louisiana's prosecuting authorities, court, juries and governors' pattern and practice of discriminating on the basis of race, gender and poverty in the administration of capital punishment.  Kyles has offered no proof that a constitutionally significant element of racial or economic bias infects the Louisiana scheme.  McCleskey v. Kemp, 481 U.S. 279, 313, 107 S.Ct. 1756, 1778, reh'g denied, 482 U.S. 920, 107 S.Ct. 3199 (1987).  However, even assuming that such bias is present, Kyles has offered no proof that the Louisiana legislature maintained a death penalty because of an anticipated racially or economically discriminatory effect.  Id., 481 U.S. at 297-98, 107 S.Ct. at 1769; Brogdon v. Blackburn, 790 F.2d 1164, 1170 (5th Cir.), reh'g denied, 793 F.2d 1287 (5th Cir.1986), cert. denied, 481 U.S. 1042, 107 S.Ct. 1985 (1987).  Accordingly, this claim is devoid of substance.

R. Kyles claims that the cumulative effect of all these alleged "errors" resulted in the end effect "which is clearly harmful and which jointly and cumulatively deprives Curtis of his constitutional rights...."  First, this court has found that none of petitioner's claims has merit;  therefore, there is no error to accumulate.  "Zero times twenty is still zero."  Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir.1987).

138

However, the Fifth Circuit has recognized cumulative error analysis in a habeas case. Derden v. McNeel, 938 F.2d 605, 609 (5th Cir.1991). The circuit has instructed:

> The sole dilemma for the reviewing court is whether the trial taken as a whole is fundamentally unfair. When a trial is fundamentally unfair, "there is a reasonable probability the verdict might have been different had the trial been properly conducted."

Id. (citations omitted).

This court is convinced that even if one considered all of the "errors" cumulatively, the jury's verdict would have been the same. For the sake of argument, consider that Isaac Smallwood's eyewitness testimony had been impeached, there remain three disinterested eye-witnesses who identified Kyles--regardless of hair-style--as the man they saw kill Mrs. Dye or drive away in her car. These witnesses were given the opportunity (as was the jury and the trial court) to physically compare Curtis Kyles and Beanie. If there had been a reasonable doubt as to whether Beanie and Kyles could have been confused with one another, the verdict undoubtedly would have been different. As noted before, even Kyles' own witness stated that the two individuals' builds are so different that one could not confuse the two.

The court examined all of the pictures used in the photographic line-up and compared Kyles' and Beanie's pictures; it finds that they did not resemble one another. Furthermore, the argument concerning whether the attacker had plaits, braids, a

139

Jheri curl, or a bush is ludicrous. The photographic identifications were made using a picture of Kyles with a bush haircut. It was his face these witnesses recognized; these witnesses had been close enough to see and remember his face.

The allegedly cumulative effect of the claimed "non-errors" cannot change the clearly untainted evidence that was introduced. That evidence alone leads clearly and inevitably to the conclusion that Kyles killed Mrs. Dye in cold blood, in the course of an armed robbery. No amount of irrelevant technicalities can change that result.

Kyles got a fair trial--not simply a fundamentally fair trial, but a clearly fair trial.

V. Error in the Supreme Court

Petitioner argues that the Louisiana Supreme Court erroneously concluded that Beanie testified at trial which he did not. Petitioner has not demonstrated that the court's error prejudiced him, and on review of the entire trial record and post-conviction hearing, the court finds that Kyles has received treatment throughout his trial and post-conviction relief that passes constitutional muster.[100]

VI. Error in the Evidentiary Hearing

---

[100]The court would note, in passing, that it understands how such an error could occur. The record in this case is confusing, at best, and possibly misleading, at worst, even with careful study. While briefing was generally voluminous, it often afforded little help in unraveling, and was often the source of obfuscation, as to the procedural and factual background of Kyles' trial.

Kyles' final argument is that his right to a complete evidentiary hearing was "undermined when the trial court refused to permit Curtis, who was found to be impecunious, funds with which to hire experts and investigate by means of civil discovery." Kyles presents neither statutory authority nor constitutional mandate for such hiring of experts. But of equal importance, he offers no reason why in this instance the trial court should have provided such funds: Kyles presents no indication of what kind of experts he believed would have been helpful; the kind or nature of the evidence such experts would have produced; or what effect that "expert" evidence would have.[101] Furthermore, there was expert testimony by Mr. Dalton concerning the effectiveness of counsel claims. Ms. Hillary Murphy, who technically may not be an "expert," nevertheless presented evidence in regard to the identification of Kyles and Beanie. The fact of the matter is that the evidence was overwhelming; the court does not believe that any "expert" testimony could dissuade the court of its belief in the fairness of this trial or the propriety of the results reached by the jury.

### Conclusion

Curtis Lee Kyles stands convicted of a senseless and brutal murder of an elderly woman committed during an armed robbery. He

---

[101]If indeed Kyles is again raising the argument that an eye-witness expert should have been hired, the court reiterates that such practices were not the norm at the time of Kyles' trial and the failure to fund the hiring of an expert does not rise to the level of a constitutional deprivation of Kyles' rights in this instance.

141

has been sentenced to death after due deliberation by a fair and impartial jury. This court in reviewing the entire record believes that he received a fundamentally fair trial and that the verdicts rendered at both the guilt phase and the sentencing phase of this trial are not suspect. Kyles has been afforded justice concomitant with that which is required under the United State Constitution, and is therefore not entitled to the relief of the Great Writ. Accordingly,

IT IS ORDERED Curtis Lee Kyles' Petition for Writ of Habeas Corpus is DENIED.

The stay of execution will be lifted by separate order.

APPENDIX B

---

Curtis Lee KYLES

versus

John WHITLEY, Warden Louisiana State Penitentiary, Angola, Louisiana.

Civ. A. No. 90-4301.

United States District Court, E.D. Louisiana.

June 1, 1992.

142

ARCENEAUX, District Judge.

ORDER AND REASONS

A motion and memorandum in support of petitioner's relief from judgment pursuant to Fed.R.Civ.P. 60(b)(2) and (6) has been filed by petitioner Curtis Lee Kyles. Having reviewed the memorandum and affidavit of Darlene Kersh (who was known at the time of Kyles' trial as Darlene Cahill), the court finds that petitioner's motion to be meritless.

Ms. Kersh was one of four eye-witnesses who made a positive identification of Kyles at trial and was the only witness who had not identified Kyles in a photographic line-up. Ms. Kersh now avers that she never actually saw Kyles' face and testified untruthfully at the behest of the police and the district attorney's office. Petitioner claims that this information "undermines the entire premise of this Honorable court's conclusion that Mr. Kyles received a fair trial based upon eyewitness testimony."

This court entered judgment on petitioner's motion on March 30, 1992, and petitioner filed his notice of appeal on April 2, 1992. He now moves the court for relief based on the affidavit of Darlene Kersh.

Standard of Review

Rule 60(b)(2) and (6) provide:

> On motion and upon such terms as are just, the court may relieve a party ... from a judgment, order, or proceeding for the following reasons: (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)[; . . .]

143

and (6) any other reason justifying relief from the operation of the judgment.

In this instance, with the appeal pending, this court does have jurisdiction to consider the motion and deny it on the merits without obtaining leave of the court of appeals. The United States Court of Appeals for the Fifth Circuit has held that:

> When a Rule 60(b) motion is filed while an appeal is pending, this circuit, along with other circuits and the commentators, has expressly recognized the power of the district court to consider on the merits and deny a 60(b) motion filed after a notice of appeals, because the district court's action is in furtherance of the appeal.

Willie v. Continental Oil Co., 746 F.2d 1041, 1046 (5th Cir. 1984), citing Lairsey v. Advance Abrasive Co., 542 F.2d 928 (5th Cir. 1955).

The court finds that this new claim constitutes an abuse of writ which precludes the court from reviewing this claim. Petitioner has failed to provide the court with an adequate demonstration that he exercised due diligence to discover the evidence which he presents to this court as "new." While the affiant Kersh may not have had a telephone number listed as Darlene Cahill, there are other avenues using public records by which petitioner could have located this witness prior to his filing his first habeas petition. The petitioner has failed to show that he was impeded by some objective factor external to the defense such as governmental interference or the reasonable unavailability of the factual basis for the claim which prevented him from raising this claim. McClesky v. Zant, 111 S.Ct. 1454, 1473 (1991).

144

Furthermore, even if the Kersh affidavit were true, such evidence would not have affected the jury verdict in this case. Her testimony was cumulative and in the context of the entire trial transcript, rather inconsequential. Given the totality of the evidence and the remaining three eye-witnesses who chose Kyles out of a photographic line-up and who were cross-examined by Kyles' counsel during a motion to suppress, the court is not persuaded that Kyles did not receive a fundamentally fair trial. While Ms. Kersh's affidavit is disconcerting in that perjured testimony given at the urging of the government in such a prosecution must not be countenanced, Ms. Kersh's testimony was of little consequence in relation to the other eye-witnesses and the evidence found in Kyles' girlfriend's apartment.

Finally, under section 2254(b), a prisoner must first exhaust his state remedies prior to raising that claim in federal court. Rose v. Lundy, 102 S.Ct. 1198 (1982). This new "evidence" really is a new and independent basis for relief which has never been presented to the state court. As such, this court cannot grant the relief requested. Accordingly,

IT IS ORDERED that plaintiff's Rule 60 motion is DENIED.

145